[No. 15031.   Department One.   January 10, 1919.]

Spokane Union Stockyards Company, *Appellant*, v. Maryland Casualty Company, *Respondent*, W. H. Ralph, *as Ralph Commission Company et al., Defendants.*[1]

Principal and Surety (26)—Discharge of Surety—Change of Parties. The surety upon a bond guaranteeing the contracts of an individual is discharged and not liable, where thereafter such individual entered into a partnership and the contracts sought to be enforced were made with the partnership.

Same. The obligee on a bond taken to guarantee the contracts of an individual doing business under an assumed name is under some obligation to inform itself of the formation of a partnership which would discharge the surety as to contracts thereafter made; and cannot plead ignorance thereof, where it knew that the principal had entered into a partnership and failed to inform itself as to the extent of the partnership.

Appeal from a judgment of the superior court for Spokane county, Blake, J., entered May 31, 1918, upon findings in favor of the defendants, in an action on contract, tried to the court.   Affirmed.

*D. R. Glasgow*, for appellant.
*E. H. Belden*, for respondent.

Chadwick, J.—For some time prior to the 6th day of January, 1917, the defendant W. H. Ralph had been engaged in the business of buying and shipping cattle, through the Spokane Union Stockyards, Incorporated, at Spokane, Washington, under the name and style of the Ralph Commission Company.

[1]Reported in 178 Pac. 3.

To save the appellant from any loss by reason of advances made by it on account of the business of the defendant, it exacted a bond to save itself harmless in the event of the failure of the defendant to meet his obligations. The bond was executed by defendant, as principal, and the respondent, Maryland Casualty Company, as surety. At the same time and up to June 2d, 1917, one J. L. Stringfield was engaged in the business of buying cattle in the country and shipping them to the yards at Spokane. He was engaged, as we take it from the testimony, in what is called the "feeder" cattle business, and had done some business with Ralph to the knowledge of appellant. On the 2d day of June, Stringfield and defendant Ralph entered into a copartnership. No notice was given of the partnership, either by publication, by the filing of a certificate showing the names of the members of the copartnership, or by direct or actual notice to the managing officers of the appellant, or to the respondent. This partnership continued until the 14th day of August, 1917, when it was dissolved, and notice of such dissolution was published in a daily paper at Spokane.

Appellant brought this action to recover the sum of $688.67, which it alleges, and the court found, that it had advanced for the account of the Ralph Commission Company. The respondent, casualty company, defended, setting up that Ralph and Stringfield had, after the time the bond was executed, entered into a copartnership and that all the business of the plaintiff had been conducted with the partnership since that time. All the items sued on postdate June 2d.

The court found that appellant had notice of this change, or, if it did not actually know of the partnership, it had sufficient knowledge and information of the dealings of Ralph and Stringfield to put it upon in-

quiry as to the nature and scope of the copartnership, and that, having such notice, either express or implied, it cannot recover upon the bond. The case is presented by appellant upon the theory that, if the appellant had no notice of the formation of a partnership between Ralph and Stringfield, respondent is liable. It is unnecessary to review the facts with reference to notice, for we are convinced that the judgment of the lower court should be sustained. The obligation assumed by the respondent was to meet certain defaults of defendant Ralph. The Ralph Commission Company is not mentioned in the bond. Ordinarily we assume that this would make no difference, but appellants knew of the trade-name under which Ralph did business, and having contracted with him, there was some obligation on its part to inform itself whether the Ralph Commission Company was, and continued to be, Ralph, individually.

The general rule is that,

"any material change in the obligation, whether prejudicial to the surety or not, will discharge him from liability . . . where there has been a release or change of principals. If a surety engages for an individual, the engagement is understood to extend to the acts of that individual alone, and will not continue if he takes in a partner; in other words, the surety for a single individual is not liable for a partnership of which such individual is a member." 21 R. C. L. 1061.

All of the books agree that the surety is not to be bound beyond the fair scope of the terms of his contract. That is, "to the extent and in the manner and under the circumstances he consented to become liable." *Friendly v. National Surety Co.*, 46 Wash. 71, 89 Pac. 177, 10 L. R. A. (N. S.) 1160, citing Brandt, Suretyship and Guaranty (2d ed.), §§ 118, 119.

The case just cited notices a rule of construction that runs through all of the cases, that is, that the surety will be presumed to have considered the responsibility of the principal at the time the obligation was assumed; that contracts insuring or guaranteeing the payment of money by an individual or a firm are sustained by a confidence in the principal, and cannot be extended to others for whose account the surety may have refused to become holden. The rule is laid down in Pingrey on Suretyship and Guaranty, § 79, as follows:

"Where the liability of the surety is limited to the transactions and defaults of a principal, he cannot be made liable for defalcations and omissions of another principal who joins the first in the business."

See, also, Stearns on Suretyship (2d ed.), § 53; Spencer, Suretyship, § 198.

"It is a case of pure guaranty; a contract which is said to be '*strictissimi juris*'; and one in which the guarantor is entitled to a full disclosure of every point which would be likely to bear upon his disposition to enter into it. . . . He has a right to prescribe the exact terms upon which he will enter into the obligation, and to insist upon his discharge in case those terms are not observed. It is not a question whether he is harmed by a deviation to which he has not assented. He may plant himself upon the technical objection, this is not my contract, *non in haec foedera veni.*" *Barnes v. Barrow,* 61 N. Y. 39, 19 Am. Rep. 247.

See, also, Brandt, Suretyship and Guaranty (3d ed.), § 133; Stearns, Suretyship (2d ed.), § 53; Spencer, Suretyship, § 198; *White Sewing-Machine Co. v. Hines,* 61 Mich. 423, 28 N. W. 157; *Dupee v. Blake,* 148 Ill. 453, 35 N. E. 867; *Mathews v. Garman,* 110 Mich. 559, 68 N. W. 243; *Parham Sewing Machine Co. v. Brock,* 113 Mass. 194; *Connecticut Mut. Life Ins.*

*Co. v. Scott*, 81 Ky. 540; *Standard Oil Co. v. Arnestad*, 6 N. D. 255, 69 N. W. 197, 66 Am. St. 604, 34 L. R. A. 861.

In the last case cited, the court said:

"A surety who engages to be responsible for the honesty of a firm may be entirely influenced by the consideration that one of the partners is a man of integrity, and of such strength of character and such shrewdness and watchfulness in business affairs, that the risk of dishonesty from the action of the other partner, in whom the surety may place no trust, is reduced to the minimum. The sureties in this case may have been willing to become bounden for the fidelity of Arnestad & Eggerud while acting as a firm, and yet at the same time not willing to incur the hazard of obligating themselves as sureties of the partner Arnestad alone. Based upon such considerations as these, the rule of law has long been established that the surety, standing upon the very letter of his contract, may insist that he cannot be held for aught that is done after the dissolution of the firm, for which alone he became responsible. . . . The case of *Dupee v. Blake*, 148 Ill. 453, 35 N. E. 867, so far as the principle of law is concerned, presents the same features as the case at bar. The court there said: 'The rule is that, if a surety engages for an individual, the engagement is understood to extend to the acts of that individual alone, and will not continue if he takes in a partner. In other words, the surety for a single individual is not liable for a partnership of which such individual is a member. A surety who guarantees that a firm composed of particular individuals will do certain acts or discharge certain duties, cannot be held liable where there is a change in the firm, although the firm name is not changed. As the surety's liability is *strictissimi juris*, and cannot be extended by construction, his guaranty to a partnership is extinguished if any partner is taken into or retires from the partnership, unless it appears from the terms of the instrument that the parties intended the guaranty to be a continuing one, without reference

to the composition of the firm.   A party may be induced to become surety for the individuals who compose a firm, because of his confidence in their integrity, prudence, accuracy, and ability as business men; but he cannot be presumed to have intended to become responsible for the possession of such qualities by some third person who may afterwards be taken into the firm without his knowledge or consent.   It is often in the power of one partner, by want of discretion or integrity, to ruin another.' "

The question of notice to the obligee is discussed in that case.   It is said:

"Finally, it is said that it does not appear that the plaintiff knew of the withdrawal of Eggerud from the firm, and that hence it follows that the old firm, as a firm, was still liable to the plaintiff for the funds misappropriated, no matter by whom they were embezzled.   Upon this foundation plaintiff builds up the argument that, inasmuch as the principals in the bond are liable, so are the sureties.   But this reasoning entirely misapprehends the nature of the obligation of the sureties in this case.   By signing the bond, they did not, in effect, assert to the plaintiff that they would be bound whenever the principals in the bond were liable in any way to the plaintiff, whether because of their having embezzled the property, or by reason of the doctrine of estoppel which would seal their lips against a denial of liability.   They merely agree to become responsible for the fidelity of the firm so long as each of the members of the firm should remain in the business.   They contracted to be bound for the acts of Arnestad so long as they could have the protection resulting from the association of Eggerud with him in the same business.   But they did not guarantee the integrity of Arnestad alone, unwatched and influenced by Eggerud, who may have been the only person in whom they reposed any trust. If the plaintiff was ignorant of the change in the firm, so were the sureties; and, if the sureties have a right to stand upon the terms of their contract, then it behooved the plaintiff to ascertain at its peril whether

all the persons for whom the sureties had become responsible still remained at the helm of the business of the agency. On this point the decision of the court in *Birch v. De Rivera* (Sup.), [53 Hun 367], 6 N. Y. Supp. 206, is decisive. The court there said: 'The fact that the plaintiffs were not notified of the change is immaterial. They may have an action against the firm as it existed before the change, because of failure to notify them of such change, or to publish the notice of dissolution. That proceeds upon another principle—presumption attached to continuous firm dealings without notice. The guarantor, however, is not responsible for a state of facts which might justify a recovery against the original members. There is no evidence here that he was aware of the change. He seems to have been as much without notice as the plaintiffs. But, were it otherwise, we may say, in the language of Lord Blackburn, 'nothing is stated to show either that the defendant was under obligation to inform the banking house of the fact, or that he took steps to conceal it.' At all events, his contract is to guaranty a co-partnership composed of certain persons, and that contract cannot be altered or extended without his consent.' See, also, *Backhouse v. Hall*, 6 Best & Smith, 507.''

Appellant claims that there is an exception to the rule; that is, where the principal, after executing the bond, took in a partner and the goods were delivered on the credit of the principal and charged to his individual account, citing *Gilbert v. State Insurance Co.*, 3 Kan. App. 1, 44 Pac. 442, and Brandt, Suretyship and Guaranty, § 137, which is no more than the holding of the court in *Palmer v. Bagg*, 56 N. Y. 523.

But these cases, if they be sound, may be sustained upon an entirely different theory. They are cases where the obligee had appointed an agent for whose personal honesty the surety stands sponsor, thus raising a personal relation between the parties, and, so long as the relation of principal and agent continues

to exist, the principal can look to the agent and will not be bound by the manner in which he does his business, whether by the employment of clerks, by doing business with another upon a commission basis, or by taking in a partner.

The case of *Palmer v. Bagg, supra,* is noticed in *Standard Oil Co. v. Arnestad, supra.* It is there said:

"But, in our judgment, these cases are plainly distinguishable from the case before us for final settlement. Their facts were different from the facts of this controversy in vital particulars. The sureties there had become responsible for the honesty of an individual agent. As the court very properly held, such sureties took the risk, not only of their principal's honesty, but also of the dishonesty of those whom he might employ in any capacity to assist him in the prosecution of the business of the agency. Should he hire a subagent as an assistant, the sureties would still be bound. And so they would remain liable if he should see fit to give such assistant an interest in the property of the business of the agency, provided the obligee did not deal with the new firm as agents, and thus extinguish the original agency. The sureties in those cases undertook to guarantee the fidelity of the agent to his trust, and therefore necessarily agreed to be responsible for whatever he should do himself or through his agents and employees. They agreed to assume the risk of his integrity and his business judgment in employing assistants in any capacity. It is upon this ground that all these decisions relied on by counsel for plaintiff proceed."

But if it be held that notice to the appellant must be shown, we think there is enough in the record to sustain the finding of the court that appellant ought to have known of the new relation. It knew that it had taken the bond of Ralph as an individual; it knew of the name and style under which he did business; it knew that Stringfield had been engaged in business on

his own account; it knew that a partnership actually existed between Stringfield and Ralph, but assumes to excuse itself by saying that it understood that their partnership was in the feeder cattle business and not in the commission business. There is no showing that, after the second day of June, appellant ever had any business at all with Stringfield as an individual. Cattle were shipped in by him and were sold at auction in the yards by Ralph, to its knowledge. These transactions, so far as the bookkeeping of the parties go, were carried out in the name of the Ralph Commission Company, so that, if the case depends upon notice and one of two innocent parties is to suffer, we think, clearly, that there was a duty upon appellant to inform itself of the extent of the partnership which it admits, and of which it took no concern upon an assumption which it is now certain had no foundation in fact.

The judgment of the lower court is affirmed.

MAIN, C. J., MACKINTOSH, and TOLMAN, JJ., concur.