[No. 550-3.   Division Three.   November 19, 1973.]

J & J ELECTRIC, INC., *Appellant,* v. GILBERT H. MOEN COMPANY *et al., Respondents,* UNITED PACIFIC INSURANCE COMPANY, *Appellant.*

*F. N. Halverson* (of *Halverson, Applegate, McDonald, Bond, Grahn, Wiehl & Almon*), *Richard M. Stanislaw* and *Sam E. Baker, Jr.* (of *DeGarmo, Leedy, Oles & Morrison*), for appellants.

*Douglas A. Wilson, Gordon W. Moss* (of *Lane, Powell, Moss & Miller*), *Robert R. Redman* (of *Gavin, Robinson, Kendrick, Redman & Mays*), and *Martin L. Wolf* (of *Wolf & Hackett*), for respondents.

GREEN, C.J.—A lien foreclosure action brought by J & J Electric, Inc., an electrical subcontractor, against First Baptist Homes, Inc. mushroomed into a series of claims and counterclaims with additional parties. The other participants are: Gilbert H. Moen Company, the prime contractor, and its surety, St. Paul Fire & Marine Insurance Co.; United Pacific Insurance Company, J & J Electric's surety; Manson Bennett of Seattle, and Paddock & Hollingberry of Yakima, architects; and Bouillon, Christofferson & Schairer, electrical engineers. These claims and counterclaims were disposed of by the court without a jury. J & J Electric and United Pacific appeal from a judgment entered in favor of Moen against them for $110,907.74 plus costs. United Pacific appeals from the summary judgment dismissing its claim against the architects and engineers.

On May 19, 1967, Gilbert H. Moen Company, as prime contractor, executed a contract with First Baptist Homes to construct an 11-story, 153-unit senior citizens home in Yakima. On July 15, Moen subcontracted the performance of

the electrical work to J & J Electric. Thereafter, United Pacific issued a surety bond insuring J & J Electric's faithful performance. J & J Electric's performance was materially deficient under its contract. On June 29, 1968, Moen notified J & J Electric in writing that unless the deficiencies were cured by July 22, another electrical subcontractor would be secured to complete the contract. About October 4, 1968, the approximate time the prime contract was to have been completed, Moen terminated J & J Electric and tendered to United Pacific the opportunity to correct and complete the work required by the electrical subcontract. It refused and Wilson Electric Company was employed by Moen to correct and complete the electrical work. This work was satisfactorily completed and accepted on April 4, 1969.

■■ Error is assigned to the italicized portion of the following findings of fact:

11.

Mr. Donald Moen was advised on several occasions, starting early in the job by Bouillon, Christofferson and Schairer that there were deficiencies in J & J's electrical work. *That he was unaware of the substantial nature of these deficiencies and understood that the same were being called to the attention of the architect and relied upon the architect's judgment in connection therewith.*

13.

J & J Electrical thereafter commenced to furnish labor and material in connection with said contracts. J & J's performance was materially deficient and substantially deviated from and did not reasonably conform to the requirements of the contract plans and specifications or the National Electric Code. Such defects and deviations were of such a nature as to substantially and adversely affect Moen's ability to meet its prime contract obligations with the building owner. *On June 29, 1968, Moen timely delivered to J & J Electric a detailed and adequate notice of intent to terminate the subcontract (Exhibit 12), allowing J & J a reasonable time to correct said deficiencies and deviations. Moen thereafter delayed exercise of its termination right and of actual termination of the subcontract upon J & J's implied request and*

upon J &J's express assurances of correction of said deficiences and deviations. That on July 23, 1968, Moen received additional assurances that they would be timely corrected. That under the circumstances Moen was justified in relying upon these additional assurances and allowing additional time to J & J Electric in which to make such corrections. The delay in terminating J & J's performance under the sub-contract was known by J & J to be conditional upon their timely making correction of the deficiencies and deviations complained of. It became clear in mid-September, 1968, that J & J's deficiencies and deviations were not being corrected in reasonable compliance with the subcontract and Moen terminated the subcontract and terminated J & J Electric from the job.

15.

United Pacific Insurance Company was not prejudiced, injured or damaged by Moen's delay in removing J & J Electric from the job either by reason of the time granted by Moen to J & J Electric in the notice of June 29, 1968 (Exhibit 12) or in Moen's extending the time granted therein. After June 28, 1968, United Pacific Insurance Company was as aware as Moen was with the problems of J & J's performance, or had access to and received the same information as did Moen regarding such work; that United Pacific knew or had access to the same knowledge as was available to Moen as to the nature of the work to be done by Wilson Electric in correcting the deficiencies and deviations in J & J's electrical work. That United Pacific Insurance Company was aware that Wilson Electric was retained to correct such deficiencies and deviations and working upon a cost-plus basis and acquired knowledge during the period of Wilson's work that the actual correction costs would be greater than the previous estimates and greater than the amount of retainage in the hands of Moen.

United Pacific Insurance Company is not entitled to a release as surety by reason of any payment in excess of what was owed to J & J Electric by Gilbert H. Moen Company. That at the time of the last progress payment by Gilbert H. Moen Company to J & J Electric on June 10, 1968, in the sum of $13,885.25, they knew there were deficiencies in J & J's work but had no reason to believe that they were of sufficient magnitude or of such a nature as to jeopardize timely completion of the con-

*tract. That in light of the then information and the retainage still remaining, the payment was reasonably paid. Moen was not reasonably advised as to the number or severity of the defects of J & J's work at any time during the course of the job.*

21.

The defects and deficiencies corrected by Wilson Electric occurred throughout the project. In taking over the work to correct and complete the same, Gilbert H. Moen Company entered into a substantially different contract with Wilson Electric Company than it had with J & J Electric. The nature of the work to be done by Wilson Electric Company under the direction of Gilbert H. Moen Company was primarily of a corrective nature. This was known to United Pacific Insurance Company. *Defendant Moen's tender of the work to the United Pacific Insurance Company for completion, together with the need for immediate action in completing the work pursuant to Gilbert H. Moen Company's contract with Yakima First Baptist Homes, Inc., together with the difference in the nature of work to be done, entitled Gilbert H. Moen Company to reasonable latitude in making its contract with Wilson Electric Company to correct the work, and this was not unreasonably done.*

22.

The building contract between the owner, Yakima First Baptist Homes, Inc., and the contractor, Gilbert H. Moen Company, provided for liquidated damages by reason of delay in the completion of the contract in the sum of $150.00 per day. *Pursuant to said contractual provision, the contractor, defendant Gilbert H. Moen Company, paid to the owner the sum of $27,000. The evidence indicates that the electrical work was the primary factor which held up completion of the job and acceptance of the work by the owner through its architect. That the defendant, Gilbert H. Moen Company, is entitled to recover from the plaintiff, J & J Electric, Inc., and its surety, United Pacific Insurance Company, $14,727.00.*

23.

*By reason of the default of J & J Electric, Inc., it was necessary and reasonable for the contractor, Gilbert H. Moen Company, to expend the sum of $134,133.86 for labor and materials in completing and correcting the work which was to have been performed by J & J Elec-*

*tric in conformance with the plans and specifications and the National Electrical Code.*

24.

*Defendant, Gilbert H. Moen Company, further expended the sum of $12,927.60 in interest by reason of the default of said J & J Electric, Inc., and is entitled to recover said sum from the plaintiff, J & J Electric, Inc., and from its surety, third party defendant, United Pacific Insurance Company. That defendant, Gilbert H. Moen Company, is entitled to recover from plaintiff, J & J Electric, Inc., and its surety, United Pacific Insurance Company, reasonable attorney's fees in the amount of $22,095.00.*

That the subcontract and the subcontract bond further require that the subcontractor, J & J Electric, Inc., and its surety "indemnify and save harmless the contractor from . . . costs . . . and damages of whatsoever kind or nature arising out of, in connection with, or incident to the subcontractor's performance of the subcontract.

That in addition to its attorney's fees, Gilbert H. Moen Company is entitled to recover from J & J Electric, Inc. and its surety, United Pacific Insurance Company, its out-of-pocket costs not recoverable as statutory costs, including the cost of discovery depositions, or copies thereof, the bill for engineering services in connection with Mr. T. H. Giese's court appearance as an expert witness in the sum of $182.00, and a five percent charge for overhead and supervision of sub-contractors in connection with correction work performed in excess of the retainage in the sum of $2,350.00, and other costs recoverable incurred, for the total sum of $2,984.90.

(Italics ours.) These findings are supported by substantial evidence and they will not be disturbed. In view of this holding, we will discuss only those arguments in appellant's brief that raise questions of law.

First, it is contended that Moen breached the subcontract[1] in terminating J & J Electric. It is asserted

---

[1] "(m) . . . it is specifically understood and agreed that in the event the CONTRACTOR shall at any time be of the opinion that the SUBCONTRACTOR is not proceeding with diligence and in such a manner as to satisfactorily complete said work within the required time, then and in that event the CONTRACTOR shall have the right, *after reasonable*

Moen, in failing to terminate J & J Electric on July 22, 1968, waived its June 29, 1968, notice and was required to give a new notice allowing reasonable time to correct deficiencies prior to the October 4 termination. It is urged that where performance is required by a particular date and indulgences are granted with respect thereto, the contract provision may be reinstated and used as a basis for future termination *only* after the giving of reasonable notice.[2] This rule has been applied in cases where defective or late performance has been accepted or acquiesced in prior to any notice of termination. In that situation, courts have found an intent to waive timely performance and required a reasonable notice to timely perform as a condition precedent to termination. The instant case is different.

At no time did Moen accept J & J Electric's defective electrical installation. The court found Moen delayed exercise of its right to terminate under the June 29 notice upon the express assurance by J & J Electric that the deficiencies would be cured. In these circumstances it would be incongruous and inequitable to require Moen to give another notice allowing J & J Electric additional time to cure defects that were the subject of the original notice. It would

notice, to take over said work and to complete the same at the cost and expense of the SUBCONTRACTOR, without prejudice to the CONTRACTOR's other rights or remedies for any loss or damage sustained." (Italics ours.)

[2] The most common application of this rule is in cases where late payments under a contract are accepted by a vendor. *Cameron v. Purbaugh,* 130 Wash. 440, 227 P. 858 (1924); *Reinertson v. Grant,* 140 Wash. 372, 249 P. 493 (1926); *Shorett v. Knudsen,* 74 Wash. 448, 133 P. 1029 (1913); *Radach v. Prior,* 48 Wn.2d 901, 297 P.2d 605 (1956); *Moeller v. Good Hope Farms, Inc.,* 35 Wn.2d 777, 215 P.2d 425 (1950); *Alhadeff v. Van Slyke,* 176 Wash. 244, 28 P.2d 797 (1934); *Granston v. Boileau,* 177 Wash. 640, 33 P.2d 96 (1934). The rule has been applied in other types of cases; *Opsjon v. Engebo,* 73 Wash. 324, 131 P. 1146 (1913) (a vendee consented to delay of vendor in delivery of good title); *Yours Truly Biscuit Co. v. Charles H. Lilly Co.,* 142 Wash. 513, 253 P. 817 (1927) (acceptance of late deliveries of flour waived contract provision requiring reasonable notice to comply before termination could occur); *Lockit Cap Co. v. Globe Mfg. Co.,* 158 Wash. 183, 290 P. 813 (1930) (timely delivery of lockit caps under contract waived, but reinstated by reasonable notice and termination was proper).

allow J & J Electric to profit from its own failures. It is a principle of fundamental justice that J & J Electric be estopped by its conduct to claim that Moen's June 29 notice was waived and insist upon a second reasonable notice prior to termination. *See* 5 Williston, *Contracts* § 677 (3d ed. 1961); *Schroeder v. Young,* 161 U.S. 334, 40 L. Ed. 721, 16 S. Ct. 512 (1896); *cf. Highlands Plaza, Inc. v. Viking Inv. Corp.,* 72 Wn.2d 865, 435 P.2d 669 (1967). The rule relied upon by J & J Electric and United Pacific is not applicable to the circumstances of this case and their contention must fail.

■ Second, it is contended the court erred in entering judgment against J & J Electric and United Pacific for a portion of the liquidated damages paid by Moen to First Baptist as outlined in finding of fact No. 22 above. It is argued that liquidated damages should not be apportioned. Citing *Jefferson Hotel Co. v. Brumbaugh,* 168 F. 867, 152 A.L.R. 1365-66 (4th Cir. 1909); and *Acme Process Equip. Co. v. United States,* 347 F.2d 509, 533 (Ct. Cl. 1965). We disagree.

The completion date of the prime contract was October 4, 1968. The electrical portion of the contract was completed and approved on April 8, 1969; and the entire contract was completed and accepted by the owner on September 1, 1969. First Baptist chose to hold Moen liable under the liquidated damage provision of its contract for the delay of approximately 11 months. A negotiated settlement was reached in the amount of $27,000. The trial court reasoned that because J & J Electric was responsible for 6 months of the delay, damages should be assessed against it and United Pacific for six-elevenths of $27,000, or for $14,727.

*Jefferson Hotel Co.* and *Acme Process Equip. Co.* relied upon by J & J Electric and United Pacific are not apposite. In these cases, the court refused to allow liquidated damages to the owner (here, First Baptist) against its prime contractor (here, Moen) because both parties jointly contributed to the delay. That is not the situation in the instant case. Here, the evidence does not sustain a claim that

the delay can be attributed in part to the owner, First Baptist Homes. Thus, we find the award and its computation properly included in the judgment.

Neither does the evidence support the contention that the liquidated damages constituted a form of punishment.

Finally, it is asserted that Moen, in choosing to terminate J & J Electric prior to the completion date, lost its right to liquidated damages under the rule that a liquidated damage provision is inapplicable in case of total abandonment or termination before the completion date. *See* 5 A. Corbin, *Contracts* § 1072 (1964). This rule is not applicable. Moen is seeking reimbursement for damage, rather than enforcing a direct claim for liquidated damage.

Third, United Pacific contends that it was released from liability on its bond for two reasons: (1) the progress payments to J & J Electric were in excess of that owed by Moen; and (2) Moen entered into a substantially different contract with Wilson Electric than it had with J & J Electric. We disagree.

■ As to the first reason, United Pacific relies upon the rule that if a creditor does any act which materially increases the risk of liability of the surety, the surety is discharged, citing *Spokane Union Stockyards Co. v. Maryland Cas. Co.*, 105 Wash. 306, 178 P. 3 (1919). In discussing the application of this rule, the writers in Annot., 127 A.L.R. 10 (1940) observed, at page 11:

> The common-law doctrine of strictissimi juris was designed to protect gratuitous sureties, that is, private individuals who, without compensation or consideration, became sureties or guarantors for others. Such sureties were the favorites of the law, and their undertaking was construed very strictly in their favor. With the development of modern business methods, however, and the increasing prevalence of corporations engaged in the business of acting as sureties for profit, there has been a growing tendency on the part of the courts to relax the strictness of the original doctrine, as applied to such compensated sureties. And at the present time it seems to be the settled rule, except in Texas, that the rule of strictissimi juris does not apply to a corporate surety acting for

compensation, and that the undertaking of such a surety is in the nature of or analogous to an insurance contract, and is governed by the rules applicable to the latter class of contracts.

and at page 77:

The rule seems to be settled that where a construction contract requires, as a condition of payments to the contractor, a certificate or estimate of an architect, engineer, or other person designated in the contract, showing the amounts due, the owner is not responsible, as against the surety on the contractor's bond, for the mistakes of the architect or engineer, and the surety is not discharged from liability to the owner by reason of payments made in good faith in accordance with overestimates or erroneous certificates, although such payments exceed, in fact, the sums due under the contract.

In *First Nat'l Bank v. Foster,* 291 Pa. 72, 76, 139 A. 609 (1927), involving the question of a release of a guarantor, the court said:

A creditor, in dealing with the security held for the payment of a debt, is required to use ordinary business judgment and do what a prudent business man would do under the circumstances. And if he acts in good faith and without negligence, he is not responsible for a mere error of judgment on his part.

*See* A. Stearns, *The Law of Suretyship* § 6.46, n.67 (5th ed J. Elder rev. 1951); 17 Am. Jur. 2d *Contractors' Bonds* § 37 (1964). This element of good faith is recognized in *YMCA v. Gibson,* 58 Wash. 307, 314, 108 P. 766 (1910), where the court said:

[T]he appellant [owner] having acted upon them [the estimates] in good faith and without fraud, we have no hesitation in saying that its conduct in that behalf did not release the surety.

In the instant case, the court found on substantial evidence that at the time of the last progress payment Moen knew there were deficiencies in the electrical work but had no reason to believe they were of sufficient magnitude to jeopardize the timely completion of the contract and that the retainage was reasonably sufficient to insure comple-

tion. Implicit in this finding is that Moen acted in good faith and without knowledge that such progress payment would impair the United Pacific security. In contrast, *Peters v. Mackay*, 20 Wash. 172, 54 P. 1122 (1889), and *Black Masonry & Contracting Co. v. National Sur. Co.*, 61 Wash 471, 112 P. 517 (1911), relied upon by United Pacific were cases where advances were made to a contractor with knowledge that such advances were not due or owing. In that situation, the surety was released. Such is not the case here. Moreover, there is no evidence that the percentage of completion was erroneous. The ultimate cost of correction by Wilson Electric is not proof that the estimate of completion was erroneous where the correction entailed removal of walls and replacement of defective work.

We are unable to agree with the contention that, because the contract with Wilson Electric was on a cost-plus percentage basis instead of a lump sum, it constituted a substantially different contract thereby releasing United Pacific on its bond. As the trial court said:

> It seems to the court that Moen's tender of the work to United Pacific for completion [which was rejected], plus the need for immediate action in completing the work under Moen's contract with Yakima First Baptist Homes, together with the difference in the nature of the work to be done entitled Moen to reasonable latitude in making its contract to correct the work and this was not unreasonably done. United Pacific's claim to be released is denied.

The court's findings are to this effect and the evidence supports them. *Cf. YMCA v. Gibson, supra.*

Fourth, United Pacific contends that Moen is estopped from recovering damages against it by virtue of Moen's representations as to the cost of correction and completion. United Pacific asserts that when it refused Moen's offer to complete the electrical contract, it relied upon Moen's representation that the job would cost $20 to $40 thousand. It is contended that if United Pacific had known the cost was going to be as much as $134,000, it would have accepted the tender and called for independent bids.

The court entered the following finding of fact to which no error is assigned:

On September 30, 1968, United Pacific Insurance Company was advised by Moen that Wilson Electric had estimated the cost of correction to be $20 to $40 thousand. United Pacific had other information that the cost was estimated upwards at $40 thousand. That on October 4, 1968, Moen was holding $75,720.68 as J & J Electric's retainage.

All parties knew that Wilson Electric's estimate was based upon the examination of only one apartment. No one knew the correctness of the installation behind existing walls. Charles F. Falskow of United Pacific, in a memo to his file (Ex. 129), stated:

Mr. Wilson stated he had inspected J & J's work and found numerous items that do not meet the contract specifications and some items that do not meet the uniform building code. Mr. Wilson could not set an exact price for the corrections but indicated the cost could run upwards of $30 thousand or $40 thousand.

United Pacific's representative, Mr. Miller, testified it was not in a position to take over the corrections because their principal (J & J Electric) disputed many of the deficient items; and consequently, if United Pacific took over the job, it would have been in dispute with its own principal.

Before estoppel can be claimed by a party, the following elements must be established: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such character as to change his position prejudicially. *Union Bank v. Kruger*, 1 Wn. App. 622, 627, 463 P.2d 273 (1969). The record amply supports the conclusion United Pacific had as much access to and possessed as much information as Moen. It did not rely upon Moen's estimate because it made and relied upon an independent inquiry. Further, United Pacific refused the tender because acceptance would have placed them in conflict with their insured. Consequently, estoppel does not apply.

Fifth, it is contended the trial court erred in its award of damages because (1) Moen failed to perform its duty to mitigate its damage; (2) it applied the wrong measure of damage; and (3) it erred in awarding interest to Moen.

As to the first point, J & J Electric and United Pacific attempt to reargue the amount of damages under the guise of mitigation. These factual disputes were resolved by the trial court and its conclusions are supported by substantial evidence and will not be disturbed.

With respect to the measure of damage it is contended that the measure should be the difference between the value of the work performed and the value it would have had if the work had been properly done. They rely upon *Forrester v. Craddock*, 51 Wn.2d 315, 321, 317 P.2d 1077 (1957), which states:

> "Where the builder has substantially complied with his contract, the measure of damages to the owner would be what it would cost to complete the structure as contemplated by the contract. *There is a substantial performance of a contract to construct a building where the variations from the specifications or contract are inadvertent and unimportant and may be remedied at relatively small expense and without material change of the building; but where it is necessary, in order to make the building comply with the contract, that the structure, in whole or in material part, must be changed, or there will be damage to parts of the building, or the expense of such repair will be great, then it cannot be said that there has been a substantial performance of the contract.* Generally, where there has not been such substantial performance, the measure of the owners' damage is the difference between the value of the building as constructed and its value had it been constructed in accordance with the contract." (Italics ours.)

and upon *Fuller v. Rosinski*, 79 Wn.2d 719, 488 P.2d 1061 (1971). The total amount of the contract price for construction of the building was $1,737,847.58. The cost of correcting the electrical work was about $134,000. In our view, the trial court properly held that the builder had substantially complied with his contract and that the measure of dam-

ages is the cost to complete the structure as contemplated by the contract.

We find that the trial court's award of interest was proper under *Prier v. Refrigeration Eng'r Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968).

Finally, United Pacific contends the court erred in granting a summary judgment of dismissal as to its claim against Manson Bennett and Paddock & Hollingberry, architects, and Bouillon, Christofferson & Schairer, engineers. In the context of the facts presented, summary judgment was properly granted.

Bennett entered into an agreement to serve as architect for First Baptist Homes. Bennett associated Paddock & Hollingberry as local architects, and the Bouillon firm was retained as consulting engineers for the electrical portion of the project. The contract between the architect and First Baptist outlined the architects' duties:

> 3.4 *Construction phase—General Administration of Construction Contracts*
>
> . . .
>
> 3.4.2 To the extent provided by the contract between the Owner and the Contractor, he shall make decisions on all claims of the Owner and Contractor and on all other matters relating to the execution and progress of the work or the interpretation of the Contract Documents. He shall check and approve samples, schedules, shop drawings and other submissions only for conformance with the design concept of the Project and for compliance with the information given by the Contract Documents, prepare change orders and assemble written guarantees required of the Contractors.
>
> 3.4.3 The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the work and to determine in general if the work is proceeding in accordance with the Contract Documents. *He will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the work and he will not be responsible for the Contractor's failure to carry out the construction work in accordance with the Contract Documents.* During such visits and on the basis of his observations while at the site, he

will keep the Owner informed of the progress of the work, will endeavor to guard the Owner against defects and deficiencies in the work of Contractors, and he may condemn work as failing to conform to the Contract Documents. Based on such observations and the Contractor's Application for Payment, he will determine the amount owing to the Contractor and will issue Certificates for Payment in such amounts. These Certificates will constitute a representation to the Owner, based on such observations and the data comprising the Application for Payment, that the work has progressed to the point indicated. By issuing a Certificate for Payment, the architect will also represent to the Owner that, to the best of his knowledge, information and belief based on what his observations have revealed, the quality of the work is in accordance with the Contract Documents. He will conduct inspections to determine the dates of substantial and final completion and issue a final Certificate for Payment.

3.4.4 If more extensive representation at the site is required, the conditions under which such representation shall be furnished and a Project Representative selected, employed and directed, shall be agreed to by the Owner and the Architect and set forth in an exhibit to this Agreement.

(Italics ours.) Paragraph 3.4.4 was never implemented.

United Pacific contends that the architects and engineers owed a duty to it to discover the faulty performance of its insured, J & J Electric, and that this duty was breached and proximately caused United Pacific to become liable upon its bond. We disagree.

An architect may be liable to the owner or a third person for damages resulting from faulty design, plans or specifications, *Clark v. Fowler,* 58 Wn.2d 435, 363 P.2d 812 (1961); *Loyland v. Stone & Webster Eng'r Corp.,* 9 Wn. App. 682, 514 P.2d 184 (1973). Other jurisdictions have held that an architect or engineer may be held liable to third parties, including a contractor's surety, for failure to perform duties undertaken by contract. *Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc.,* 392 F.2d 472 (8th Cir. 1968); *Calandro Dev. Inc. v. R.M. Butler Contractors, Inc.,* 249

So. 2d 254 (La. App. 1971). No Washington decision has imposed a duty upon an architect in favor of a defaulting contractor's surety.

Assuming arguendo that such a duty may exist in some circumstances, we do not find such a duty in this case. The architects' contract provided:

> He will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the work and he will not be responsible for the Contractor's failure to carry out the construction work in accordance with the Contract Documents.

By virtue of this provision, the architects and their consulting engineers are absolved of any liability for J & J Electric's failure to perform. The provision is plain and unambiguous. United Pacific's contention fails.

United Pacific also urges the adequacy of J & J Electric's performance was misrepresented to it upon monthly estimates for partial payment approved by Paddock. These estimates indicated the electrical work was completed in accordance with the contract plans and specifications. The estimates were prepared by J & J Electric, approved by Moen, and then submitted to Paddock for approval. The difficulty with United Pacific's position is that it never saw such progress reports. It was not until May 27, 1968, that United Pacific, pursuant to a May 23 request, received any status report as to J & J Electric's progress. Shortly after receipt of that report, it was made aware of the unsatisfactory nature of J & J Electric's performance through Moen's termination letter of June 29, 1968. United Pacific did nothing other than make themselves aware of the existing situation through discussion with its insured and others. Thereafter, it was on notice of the actual situation and had access to as much information as any of the other parties. In these circumstances, we are unable to find any actionable reliance by United Pacific upon the payment estimates issued prior to May 28 since it did not see or receive such estimates. Mr. Falskow of United Pacific testified that, if he had learned in May instead of July of J & J Electric's

defective performance, he would have taken the same action as he did in July. The record shows he did nothing in July. Consequently, we are unable to find on this record that the negligent representation, assuming there was one, caused any damage to United Pacific.

Thus, the motion for summary judgment was properly granted.

Judgment affirmed.

MUNSON and MCINTURFF, JJ., concur.

Petition for rehearing denied January 11, 1974.

Review denied by Supreme Court March 5, 1974.