CUMMINS v. McCOY et al.—125 S. W. (2d) 509.

Eastern Section. Aug. 6, 1938.

Petition for Certiorari Denied by Supreme Court, March 4, 1939.

Glen M. Elliott and Williams, Winston & Guinn, all of Johnson City, for appellant.

Simmonds & Bowman, of Johnson City, for appellee.

AILOR, J.  The preparation and presentation of this case both in this court and in the court below indicates considerable feeling on the part of the parties litigant and zeal on the part of counsel representing them.  Exhaustive and able briefs are presented on behalf of the appellants and the appellee.  They leave little to be desired in treatment of the issues involved.  The suit is essentially a contest between J. W. Cummins and W. R. McCoy, the 7-Up Bottling Co. of the Appalachians being named as a defendant largely for the sake of conformity.

J. W. Cummins and W. R. McCoy are brothers-in-law.  J. W. Cummins married the sister of W. R. McCoy and several years ago while McCoy was still only a boy he went to the home of J. W. Cummins to live.  Cummins is shown to be a shrewd business man, an official in a bank at Johnson City with numerous other business interests.  Prior to the time the parties entered upon the venture involved in this suit McCoy had not developed any outstanding business ability, and had not accumulated any considerable amount of property.  We think it apparent that McCoy had experienced a considerable struggle to provide for the needs of himself and family, and that during this period Cummins had dealt with him with a great amount of consideration.

In the fall of 1936 McCoy became interested in acquiring the controlling stock in a bottling company at Johnson City engaged in bottling a beverage put up and sold under the name of 7-Up.  The business was an incorporated enterprise and controlling stock in the amount of 162 shares was owned by a man by the name of S. E. Cunningham, who was at that time in poor health.  Cunningham and McCoy were very close friends and by means of this fact McCoy learned that the business in question was a profitable enterprise, and that Cunningham was very anxious to dispose of his stock in the corporation and give up the task of carrying on the business.  The negotiations between Cunningham and McCoy for the sale of the stock to McCoy began in September, 1936.  McCoy began to familiarize himself with the business and satisfied himself that it was a desirable venture.  Cunningham entered into a verbal agreement to sell his interest in the bottling company to McCoy for $10,000.  Thereafter the verbal agreement was reduced to writing in the form of an op-

tion, and this written option was later renewed. All negotiations for the purchase of the stock from Cunningham were carried on by McCoy, and it is clear that he contemplated acquisition of the business as his individual enterprise. However, it appears that McCoy experienced difficulty in making arrangements to finance the deal. His first plans contemplated that his father-in-law, Dr. G. E. Campbell, would be able to arrange for financing the deal. But this plan met with delays and possibly with failure. At any rate complainant Cummins learned of the situation, and proffered his assistance in making financial arrangements for the deal. We think it apparent that the intentions of Cummins in the beginning were to assist McCoy in purchasing the stock in question, and that it was not contemplated in the beginning by either of the parties that he would be personally interested in the business. It is sufficient to say at this point that Cummins furnished the collateral necessary for financing the deal, and the stock owned by Cunningham, 162 shares in all, was delivered to McCoy. It might be observed that the option to purchase was taken in the name of McCoy, he alone had any dealings with Cunningham, and the stock was transferred to McCoy individually. We think there can be no question but that McCoy prosecuted the arrangements for purchasing the stock from Cunningham with the idea that he was to be the owner of the business and that complainant first entered the picture, at least so far as McCoy was concerned, in the role of a voluntary benefactor to McCoy.

But complainant went to Florida to spend the winter before the purchase could be consummated. On December 21st, 1936, he wrote a letter to Mr. James H. Epps, an attorney of the Johnson City bar. He enclosed notes amounting to $6,000, with explanation that the deal was to be made by him and McCoy jointly, and that McCoy was to turn over to him his one-half of the stock pending liquidation of payment of his part. It contained the further stipulation that complainant was to have control of the finances of the enterprise, and that otherwise they were to have equal and joint interest in management. This letter was brought to the attention of Mr. McCoy, as indicated by his letter written a short time thereafter to complainant. But while there could be little argument about the intention of complainant to own half of the stock in question, we think the letter of McCoy indicates that he did not so understand the relationship, or at least leaves room for argument that he did not so understand it. He says, "Inasmuch as half of this stock will be in your name it will be necessary for you to sign the enclosed proxy giving me the right to vote your stock." We think the language of this letter not what would be expected from one jointly interested in a business venture to another equally interested, but it is not primarily material in the light of later developments.

After the stock had been acquired and the new enterprise was well under way complainant got McCoy in his office on January 6th, 1937, and prepared a written agreement for their signatures. We quote the provisions of this agreement in full as follows:

"We, each of us, by signature hereto, enter into agreement, as evidenced by this memorandum, that ownership the Cunningham interest in the Beverage Company, now bearing title Cunningham Beverage Company, Inc., or whatever name under which said business may be hereafter designated will participate jointly, in equal division any sums, and/or amounts, derived from ownership such stock, in so far as this particular stock is concerned.

"In other words, whatever revenue derived from salaries, however and to whomever paid, dividends, and/or other revenue as above stated and from such stock will jointly and equally accrue to W. R. McCoy and J. W. Cummins.

"This effective until such time as obligation covering acquirement Cunningham interest fully liquidated, thereafter, effective excepting only operating salary voted individual, McCoy, Cummins, or, assigns, for respective capacity within corporation."

The letters in question and the memorandum quoted represented all of the written provisions of the contract as claimed by complainant, but he attempted to supplement the written portions of the contract by oral testimony as to the agreement between himself and McCoy. The substance of his testimony is to the effect that he and McCoy agreed to enter into a joint enterprise for the purchase of the controlling stock of the Cunningham Beverage Company, and that the enterprise was to be joint so far as the conduct of the business was concerned with the exception that he was to have full charge of the finances of the same.

After the stock had been acquired a meeting of the stockholders was called. And while complainant had forwarded power of attorney for voting the stock in his name, the effect of which would have given him control of three of the five directors to be elected, he turned up in time to attend the meeting in person. We think it apparent that he proceeded from that time to move towards acquiring complete control of the enterprise. Apparently he abandoned his charitable attitude towards his brother-in-law and began to cherish visions of large financial returns to himself. He first became critical of the manner in which McCoy was handling the sales department. And then quietly began purchasing stock in the corporation then held by other parties. When McCoy learned that complainant had purchased some outstanding stock he also became active in an effort to acquire a controlling interest by purchasing outstanding stock aggregating more than fifty percent of the capital stock when added to that al-

ready owned by him. When complainant was apprised of this fact the original bill in this cause was filed.

We think it not necessary to go into the details of the averments of the original bill. The bill averred that complainants were engaged in a joint enterprise in acquiring the 162 shares of stock originally purchased, and that by force of the very nature of the enterprise, their relationship extended to every phase of the business, even to the acquisition of additional stock. It charged that the purchase, or contract to purchase, by McCoy from men by the name of Driver and Soukup of additional shares of stock in his individual name constituted a breach of their agreement, and that said contract inured to the benefit of complainant. It sought to enjoin McCoy from consummating the purchase of said stock, or in the alternative that said purchases be declared to inure jointly to complainant and McCoy. An amendment was filed charging McCoy with fraudulent handling of the sales accounts of the corporation and seeking the appointment of a receiver. But the appointment of a receiver was denied, and the charges of fraud were abandoned, and this move is of value now only to the extent that it sheds light upon the attempt of complainant to dominate the business of the corporation.

McCoy filed an answer and cross-bill. The averments of the bill relative to a joint enterprise were denied in toto. It was averred that cross-complainant had studied the bottling business at the suggestion of S. E. Cunningham, who was contemplating retirement with the idea of taking over the business then being operated by Cunningham upon his retirement. That he had arranged to finance the purchase of the Cunningham interest without the assistance of complainant, but that when complainant learned of the plans of cross-complainant he voluntarily suggested that he would aid in furnishing collateral security to further the deal. There was a blanket denial of any agreement that the parties would become joint owners of the controlling stock, but that cross-complainant was to put up the stock purchased to secure complainant on account of his endorsements, and that complainant was to hold the stock only so long as he was obligated as an endorser. The corporation filed an answer, denying the right of complainant and defendant to enter into any contract for a division of authority between the officers of the corporation contrary to the provisions of the charter and by-laws. It denied that any such agreement ever existed. These are the pleadings so far as the issues in this court are concerned.

A trial by jury was demanded and issues were made up for submission to the jury, but the Chancellor modified the issues on several occasions and finally submitted only two issues to the jury. These were answered by the jury in keeping with the contentions of defendant, McCoy, and the Chancellor disregarded the verdict of the

jury and entered a verdict in favor of the claims of complainant notwithstanding the verdict. The substance of the decree was to give effect to the contention of complainant that the parties had embarked upon a joint enterprise for the purchase of the controlling stock and the operation of the corporation engaged in bottling 7-Up. The effect of the holding was to declare the parties to be partners in the operation of the enterprise with J. W. Cummins as a minority stockholder the final authority on all matters of controversy. Defendant and cross-complainant made a motion for new trial which was denied, and he has appealed in error to this court. Numerous errors have been assigned for reversal of the decree of the Chancellor.

We do not think it necessary to take up the errors assigned in the order of their assignment or to treat them separately. We treat them with reference to the questions raised. It is first insisted that the Chancellor erred in sustaining the claim of complainant that he and defendant had entered upon a joint enterprise in acquiring the controlling stock of the Cunningham Beverage Co. The insistence is made in this connection that the contract averred and testified to by complainant is void as against public policy. We think there is merit is this insistence not only for the reason that it would be against public policy, but for the further reason that such a contract would be wholly incapable of execution.

We think the very first move made by the parties after they had acquired the controlling stock in the corporation demonstrates conclusively that the enterprise could not be carried on as a joint enterprise. The first step taken by the parties after they had purchased the Cunningham stock to call a meeting of stockholders to elect new directors of their selection. McCoy wanted stockholders of his selection and Cummins wanted stockholders of his selection. Cummins had McCoy in his power by reason of his financial assistance, and he dictated the directors selected, McCoy apparently surrendering his right to an equal voice without serious protest. It might be said that McCoy could not complain in this connection for the reason that he made no protest, and this is true. We only cite this situation to illustrate the fact that it was impossible to carry on the business as a joint venture in the true sense of the word. The conduct of a corporation is regulated by the provisions of its charter and by-laws passed pursuant to law, and any agreement made contrary to law is unenforceable.

But regardless of the fact that McCoy acquiesced in the original board of directors dictated to Cummins, he later became dissatisfied and took steps to assert his rights. Cummins purchased a small block of stock without the knowledge of McCoy, and was negotiating for the purchase of still more stock. When McCoy learned of this fact he likewise took steps to purchase other stock, and he

succeeded in entering into a contract for the purchase of sufficient stock to give him undisputed control of corporate affairs. When Cummins learned about this transaction, he filed his bill in this cause. He now says that he was purchasing stock for the joint interest of himself and McCoy, but he did not purchase the stock in their joint names, and neither did he inform McCoy of his intention to purchase the stock in advance of the purchase or thereafter until McCoy had otherwise learned of the purchase. Purchase of stock by McCoy was made in his own right and for his own benefit. This conduct clearly indicates that the parties had reached the stage where they could no longer agree. No other conclusions could be reached from their conduct, and if any doubt remained as to this, their testimony given in the cause clearly demonstrates that they had reached an impasse so far as further agreement was concerned. The joint enterprise sought to be set up by Cummins was dependent upon the agreement of the parties. They had no agreement in advance as to any of the details of the business. We think the claim of a joint enterprise as insisted upon by Cummins, under the circumstances, was an impossibility. There was no authority to require the parties to agree on any matter of controversy, and under the claim advanced, they could not combine with other stockholders to break the impasse created by their disagreement. We think the agreement sought to be set up by Cummins was a nullity for the reason that it was impossible of enforcement.

According to the testimony of Cummins the agreement vested him with authority to control the financial affairs of the corporation. In other words it lodged in the hands of a minority stockholder the control of the fiscal affairs of the corporation. McCoy was bound to permit Cummins to dictate the amount of salaries to be paid and the parties to receive them. He would have authority to declare or withhold dividends at will, even though he owned only a minority of the stock. And this was true without regard to the rights of other stockholders or the provisions of the charter or by-laws.

██ The guide to the conduct of the affairs of a corporation is to be found in the provisions of its charter and its by-laws promulgated in conformity with the law. Any side agreements contrary to or subversive of such provisions of a charter of incorporation and by-laws of a corporation would be contrary to public policy and unenforceable. It is well settled that an agreement binding a stockholder to vote contrary to his duty as a stockholder is void. Guernsey v. Cook, 120 Mass., 501; Van Slyke v. Andrews, 146 Minn., 316, 178 N. W., 959, 12 A. L. R., 1068.

██ The Chancellor refused to pass upon the question of the legality of the contract, for the reason as announced by him that this question was not raised in limine. We think the Chancellor was in error in refusing to pass upon the question when raised by motion

for new trial. The question of illegality of a contract may be raised at any stage of the proceedings, and a court may take cognizance of such illegality of its own motion. And an appellate court will repel one seeking the benefits of an illegal contract, where such question is not raised by the pleadings or by motion for new trial, or even in assignment of errors. Courts do not lend their aid in enforcing illegal contracts. See Reaves Lumber Co. v. Cain-Hurley Lumber Co., 152 Tenn., 339, 344, 279 S. W., 257.

We think it must be concluded that the contract relied upon by complainant was void for the reason that it was impossible of performance, and for the further reason that it was void as against public policy, and that the Chancellor should have so held. To the extent that the Chancellor found and held that the contract between complainant and defendant resulted in a joint venture, same must be modified. All errors assigned in this connection will be sustained.

It is further insisted on behalf of McCoy that the original purchase of the Cunningham stock was for his individual benefit and that Cummins was not to have any beneficial interest in same. We think this insistence must be rejected at this time. While we are of opinion that McCoy at first intended to acquire the business for himself, he later entered into a written agreement in which it was stipulated that he and Cummins would participate jointly "in equal division any sums, and/or amounts, derived from ownership such stock, in so far as this particular stock is concerned." The reference was to the Cunningham stock, and it was specifically limited to that stock. The testimony of cross-complainant to the effect that all of the stock purchased from Cunningham was to belong to him individually would operate to conduct the written instrument signed by him, and it would contradict the ratification of same shown to have followed in the application of salaries paid. It is true that the alleged contract was partly in writing and partly in parol, but the agreement with reference to the ownership of the stock is evidenced by written agreement and signed by both of the parties. And the evidence is conclusive that they continued to operate under this agreement as to the ownership of the stock purchased from Cunningham. Under these circumstances we think parol evidence was not admissible to vary the written contract, and that no question for submission to the jury was presented by the insistence on behalf of McCoy that he was to own all of the stock purchased from Cunningham when it was paid for. Errors assigned to the action of the Chancellor in withdrawing this issue from the jury are overruled.

We have held that the contract sought to be set up by Cummins was void as against public policy and for the further reason that it was incapable of performance. We think the complainant must fail for a further reason. Both parties purchased additional stock

in their own name, and while Cummins says that he purchased the stock for the joint benefit of himself and McCoy, McCoy says that he purchased his stock for his individual use. And we think there can be no escape from the fact that McCoy made the purchases in question after learning that Cummins had purchased stock, and that the stock of Driver and Soukup was purchased by McCoy in order that he might obtain control of a majority of the stock of the corporation. This question was submitted to the jury to determine whether or not either of the parties had violated their agreement by their respective purchases of stock. The jury answered the two questions in the negative, finding that neither party had violated any agreement by purchasing stock in his own name. And while there might be some question about the effect of the finding of the jury as to the purchase of the stock by Cummins in the light of his insistence that he made the purchase for the joint interest of himself and McCoy, there can be no question about the result of the finding so far as the purchase of stock by McCoy was involved. He made the purchase in his own name for the purpose of gaining control of a majority of the stock of the corporation. The jury found as a fact that this action on the part of McCoy violated no agreement which he had with complainant, consequently finding that they had no agreement with reference to the purchase of additional stock.

If it could be said that the parties were engaged in a joint enterprise, and that they were bound to exercise the utmost good faith towards each other in connection with the enterprise in which they were engaged, then it must be admitted that Cummins first violated this relationship when he purchased additional stock without the knowledge or consent of McCoy. The agreement made by them was specifically limited to the acquisition and ownership of the Cunningham stock or interest as it was designated in the written memorandum signed by the parties on January 6th, 1937. If it could be said that their relations were as insisted upon by complainant, then before either attempted to bind the other by purchase of additional stock for their mutual benefit, it was the duty of the one so purchasing to obtain the consent of the other. Cummins admits that he purchased additional stock without having first informed McCoy of the fact, but tries to excuse himself by saying that he made the purchase for their mutual benefit. It is not material at this time to determine the truth or falsity of this position, but it is typical of the attitude of Cummins in assuming that it was his privilege to dictate the policy of the business without much consideration to McCoy. But we think it constituted a breach of the agreement sought to be set up by Cummins in any event. Assuming that he made the purchase for the joint benefit of himself and McCoy, it constituted a violation of the agreement, in that it operated to invest money of

McCoy without his consent, and therefore violated the duty he owed to McCoy. On the other hand if we assume that he made the purchase for his individual benefit, he would not be heard to complain about the action of McCoy in purchasing the stock from Driver and Soukup. A party first violating material provisions of a contract will not be heard to complain of a later violation of a similar nature by the other party to the contract.

There is another feature of this case, while not material at this time, which we think it not out of place to notice. Cummins claims that he was to have complete control over the financial affairs of the corporation. There is no dispute as to the fact that he exercised full control in this field. McCoy was to have control over sales and distribution. When friction developed Cummins made very serious charges against McCoy in connection with his handling of sales. These charges were not substantiated and were dropped, and so far as this record is concerned appear to have been largely unfounded. It is not necessary for us to pass upon the motives which prompted these and other serious charges, but it is sufficient to say that the parties could no longer conduct the affairs of the corporation as a joint enterprise, assuming that they had agreed to do so. In order to prevent a stalemate in corporate affairs it would have been necessary for the parties to either liquidate or for one of them to either purchase sufficient stock to obtain a majority or to join with other minority holders in order to procure a majority. The results of the latter alternatives would be the same.

The original written contract specifically limited the agreement to the Cunningham stock, and there is no specific showing of any supplemental agreement entered into thereafter. The effect of the Chancellor's holding that the purchase of the stock by McCoy from Driver and Soukup should enure to the mutual benefit of the parties was in effect the making of a contract by the court for the parties, which is not permissible. They were capable of entering into a binding contract, and their valid contracts so established will be enforced. But we conclude that they entered into no valid contract for a joint venture, and that the decree of the Chancellor to this effect must be reversed. And the decree will also be reversed in so far as it declared purchases of stock by Cummins and McCoy to be for their joint interest. It results that Cummins obtained no relief under the prayer of the original bill. The claims of McCoy are denied primarily to the extent that he claimed the original purchase of stock from Cunningham was made for his individual benefit. Practically all of the costs of the lower court were accumulated in support of and in rebuttal to the claims of complainant. For this reason

692

the costs of the lower court will be paid three-fourths by Cummins and one-fourth by McCoy. The costs of the appeal will be paid by Cummins.

Portrum and McAmis, JJ., concur.