**W.F. HOLT COMPANY,**
**Plaintiff-Appellant,**

v.

**A & E ELECTRIC COMPANY, INC., et al., Defendants-Appellees.**

Court of Appeals of Tennessee, Middle Section at Nashville.

Nov. 7, 1983.

Permission to Appeal Denied by Supreme Court Jan. 30, 1984.

William Hume Barr and Craig V. Gabbert, Jr., Harwell, Barr, Martin & Sloan, Nashville, for plaintiff-appellant.

William Thomas McHugh, Tune, Entrekin & White, Nashville, for defendants-appellees.

## OPINION

CONNER, Judge.

This is a construction dispute. Though at one time there were other parties to the litigation, this appeal concerns only a general contractor, W.F. Holt Company, plaintiff-appellant (Holt), and an electrical subcontractor, A & E Electric Company, Inc., defendant-appellee (A & E).[1]

Two projects are involved, the Holiday Inn at the intersection of Briley Parkway and Elm Hill Pike and the Gresham & Smith Office Building on West End Avenue, both in Nashville. The principal dispute, monetarily and otherwise, centers around the Holiday Inn complex wherein A & E was the initial electrical subcontractor to Holt, which in turn held the general contract with the owner.

## THE PROCEDURAL BACKGROUND

This action was commenced on December 6, 1979, when Holt sued A & E, its principals, Walter Edwards and Ronald Edwards, and an affiliate, A & E Electric Service, Inc. (A & E Service), for breach of contract and conversion. Holt sought damages and an injunction prohibiting defendants from coming on the Holiday Inn project.

A & E answered denying the breach. It asserted a counterclaim against Holt, and a third-party claim against Fuellgraf Electric Company of Tennessee, Inc. (Fuellgraf) for conspiring to have A & E terminated under its contract with Holt and removed from the site, and for illegally entering the work trailers of A & E and taking possession of the materials, supplies and work products of A & E. Fuellgraf had been hired by Holt to replace A & E after its termination. A & E likewise sought damages and injunctive relief to bar its termination. A & E later filed an "Amended and Supplemental Cross-Claim" alleging that General Electric Supply Company (GESCO), a material supplier, was a party to the conspiracy with Holt and Fuellgraf. A & E sought dam-

ages and injunctive relief to bar GESCO from cancelling the purchase orders of A & E on the Holiday Inn project.

On March 12, 1980, A & E Service instituted a separate lien lawsuit against Holt and the owners of the Holiday Inn project. The cases were consolidated for trial.

On the eve of trial in May of 1981, A & E filed a "Supplemental Answer and Counter-Claim," asserting waiver, estoppel and laches as defenses to Holt's allegations of breach of contract, and also seeking damages from Holt for (1) various breaches, including failure to properly make progress payments pursuant to its subcontract with A & E; (2) for the reasonable value of labor and materials which A & E had furnished to the Holiday Inn project and for which it had not been paid; (3) for tortiously inducing the breach by GESCO of its contracts with A & E, in violation of common law and T.C.A. § 47–15–113; (4) for conversion of A & E's property; and (5) for *quantum meruit* for the reasonable value of services rendered by A & E to Holt with regard to the Gresham and Smith project wherein it was never awarded a subcontract.

A & E also sought recovery of damages against Fuellgraf for (1) its alleged conspiracy with Holt; (2) tortious interference in A & E's contractual relationship with Holt; and (3) conversion of A & E's materials, supplies and purchase orders.

A & E, A & E Service, Walter Edwards and Ronald Edwards, and GESCO reached a pre-trial settlement. A non-jury trial between the remaining parties over portions of seven days was held in May of 1981.

Thereafter, the chancellor took the case under advisement and issued a lengthy memorandum opinion on November 13, 1981, which was subsequently reduced to judgment. The chancellor found that A & E had breached the Holiday Inn subcontract. The trial court originally awarded $51,789.00 to Holt against A & E. This

---

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbrevi- ated.

represented the difference in the total amount Holt spent to complete the electrical subcontract work and the amount of the A & E subcontract. The chancellor dismissed all of the claims by A & E, expressly finding that Holt did not breach its subcontract with A & E and that Fuellgraf did not tortiously interfere with A & E's contract nor conspire with Holt to remove A & E from the job.

However, in response to a "Motion to Reconsider" filed by A & E the trial court amended its prior decision to find that Holt had also breached the Holiday Inn subcontract by its failure to make progress payments to A & E. The chancellor then awarded damages to A & E in the full amount of those progress payments, $167,-813.64, plus $7,500.00 for materials remaining on the project site. The court also awarded A & E damages of $7,000.00 on the theory of *quantum meruit* for work performed by A & E on the Gresham and Smith project. Moreover, the trial judge reduced the amount of damages originally awarded to Holt to $48,481.00 to correct an earlier miscalculation. After Holt then filed a "Motion to Alter or Amend Judgment," the chancellor disallowed the previous $7,500.00 award for stored materials.

Holt appeals the chancellor's amendment of the original judgment and the award of any damages to A & E. Holt argues that the chancellor erred in finding Holt breached the Holiday Inn project subcontract by not making progress payments; that even if this failure to make progress payments amounted to a breach the chancellor erred in calculating damages; and that the chancellor erred in holding A & E entitled to recovery in *quantum meruit* for the preparatory work done on the Gresham and Smith project. A & E by cross-appeal contends that it should have been awarded even greater damages for lost profits and because the actions of Holt destroyed it as a viable business.

## THE HOLIDAY INN DISPUTE

The material factual findings of the chancellor regarding the parties' dealings, as to all of which there is substantial material evidence, are well summarized in the court's initial memorandum:

"On August 8, 1979, Holt hired A & E to perform the electrical portion of the Holiday Inn project. Accordingly, the parties entered into a subcontract agreement .... The agreement provided that A & E would perform the job for a fixed price of $738,-769.00.[1]

"Holt, the general contractor for the project, had been hired by Holiday Inns, Inc., the owners, and was the second lowest bidder for the project.[2] A & E was the low bidder on the electrical portion of the contract, and Fuellgraf submitted the second lowest bid.

"Holt did not originally require A & E to post a performance bond on the subcontract. Rather, Holt allowed A & E to support its applications for payment by submitting actual supplier invoices for materials it purchased. In addition, A & E agreed that Holt would issue joint checks to A & E and the supplier for all major materials purchased.

"It is noteworthy that Holt, who received a first payment of $94,230.00 on October 11, 1979, neither issued joint checks nor paid A & E any monies for work satisfactorily completed on the project.

"On or about September 25, 1979, A & E submitted its first application for payment to Holt ....[3] Such payment requests were included in Holt's application for payment from the owners. Thomas McCafferty, then employed as a vice president for Holt, edited the invoices submitted to A & E before sending the requests to Holiday Inns, Inc.

"Between October 3–5, 1979, an employee of GESCO contacted Holt and informed the company of various discrepancies in the invoices submitted by A & E. The invoices, originating from GESCO, were presented in support of A & E's Application No. 1, and were discovered to be false because they were not the original invoices issued by the supplier to A & E. Through the submittal of five false invoices, A & E

requested an overpayment of approximately $25,070.00 on material costs....

"Thereafter, a meeting was held to discuss the fraudulent invoices. Those present were Thomas McCafferty for Holt and Ronald Edwards for A & E, who admitted that A & E had attempted to defraud Holt through the fraudulent invoices. Discussions about the financial condition of A & E also occurred. Ronald Edwards told Holt through Thomas McCafferty that A & E had no debts and was not troubled financially. He stated that A & E was worth approximately $180,000.00 to $200,000.00.

"A second meeting was held between Thomas McCafferty, James Holt, and Walter Edwards to discuss the problem.

"Though fully cognizant of A & E's attempted fraud, Holt allowed A & E to continue working on the construction project. In fact, Holt told A & E that it could correct and resubmit the altered invoices. In addition, Holt would pay A & E for its labor and materials and a fair overhead in each progress payment. Further, Holt told A & E that it would thereafter be required to post a performance bond.

"A & E agreed to these conditions. Revised applications for payment were submitted ... and A & E attempted, albeit unsuccessfully, to obtain a performance bond.

"Approximately six weeks after Holt told A & E that it could remain on the project, *provided* it obtained a bond, attorneys for Holt sent a letter of termination dated November 28, 1979 .... This letter served as formal notice to A & E that the submission of fraudulent invoices prompted termination of the electrical subcontract. In addition, termination by Holt was premised upon Articles VI(a)(v) and IV(g) of the subcontract agreement. Further, the letter stated that A & E would not be authorized to remove materials ordered and stored for use on the project absent proof of payment and/or supplier releases of materialmen's liens.

"Before Holt sent the letter and A & E complained that the termination was un-justified, Holt asked Fuellgraf Electric Company to complete the job begun by A & E. (Thomas McCafferty had approached William Somers, Vice President of Fuellgraf to determine its price for completing the project. When Fuellgraf expressed a willingness to take the place of A & E, Holt and Fuellgraf entered into a subcontract agreement dated December 18, 1979 ....) Fuellgraf completed the job for an estimated price of $770,000.00.

"On or about December 5 of (sic) 6, 1979, A & E employees, including Walter Edwards, entered the Holiday Inn project site and attempted to cut the locks on the A & E supply trailer. Though the parties tried to conduct an inventory of materials remaining and missing, Walter Edwards left the premises.[4] To date, a fully satisfactory accounting of materials illegally removed from the project site by A & E onto two pickup trucks has not been presented to the Court.

"In any event, Fuellgraf did not use any of the materials already present on the site until Holt and GESCO entered into an agreement to purchase the materials. Moreover, letters were sent to the suppliers of A & E stating that A & E was no longer on the Holiday Inn project.

"The break-in by A & E employees on December 5, 1979 and the alleged breach of the subcontract agreement prompted the present suit by Holt against A & E.

"In sum, the instant cause of action may be stated in this manner: Holt has sued A & E for $51,789.00 in damages caused by A & E's alleged breach of the subcontract agreement. A & E institutes its suit against Holt for damages caused by Holt's breach of the subcontract agreement, a conspiracy between Holt, Fuellgraf and GESCO to injure A & E, a conspiracy between Holt and Fuellgraf to enter A & E's supply trailers to convert the property of A & E, tortious misrepresentation and interference by Holt with A & E's contract with GESCO, conversion of materials, trespass, and breach by Holt of A & E's alleged contract on the Gresham and Smith project. Finally, A & E seeks damages against

Fuellgraf caused by its association with Holt.

---

"[1] [Omitted.]

"[2] [Omitted.]

"[3] Before submission of the invoices, Holt informed A & E that it could include a 10% retainage in the first progress payment. Certain invoices were altered to reflect a pro rata portion of A & E's original estimates for materials.

"[4] A second inventory, conducted in the presence of Walter Edwards, revealed that $8,000.00 to $10,000.00 worth of materials were taken after the initial inventory."

Based on this procedural and factual background the chancellor concluded in the initial memorandum that five determinative issues must be resolved. The first four bear on this appeal. They are:

(1) Whether the action[s] of A & E constitute a breach of its subcontract agreement with Holt.

(2) What, if any, damages did Holt suffer as a result of the alleged breach by A & E?

(3) Whether the bond requirement and subsequent termination of A & E by Holt constitute a breach of the Holt and A & E subcontract agreement.

(4) What, if any, damages did A & E suffer because of the alleged breach by Holt?

After having delineated these issues, the trial court resolved each of them in the following manner:

## CONCLUSIONS OF LAW

### I

"*The major contention of the plaintiff Holt is that defendant A & E, through the deliberate submission of fraudulent invoices, breached its subcontract agreement. This Court agrees.*

"The Court has found that in consideration for Holt not requiring A & E to obtain a surety bond, A & E agreed to submit supplier invoices with its applications for payment. Further, A & E agreed that Holt would pay A & E's major suppliers.

"As to the conditions set by Holt to assure performance by the subcontractor,

the subcontract agreement provides at Article III and IV(g) that:

(Article III) .. Subcontractor ... shall furnish evidence, if requested, that all claims for labor, materials and other lienable items of expense have been paid.

(Article IV(g)) To pay for all material and labor and equipment used in, or in connection with the performance of the work and all costs, including without limiting the generality of the foregoing sales, use, personal property, privilege, and unemployment insurance taxes payable thereon and taxes in coonectin (sic) with the transportation of any of same to the Project, as bills and claims therefor become due, to save harmless the Project, the Owner, and the Contractor from all claims and mechanics liens on account thereof, and to furnish the Contractor, if requested to do so, satisfactory evidence that Subcontractor has complied with the above requirements; (Emphasis added).

"It appears that Holt was within its rights as defined in the original agreement. There is no reasonable explanation to justify the altered invoices, especially where the breaching party admits the act.[5]

### II

"The Court finds that Holt suffered the damages alleged to have resulted from the breach by A & E. The damages allowable are governed by Article VI(a) of the subcontract which provides in pertinent part:

In the event of termination by the Contractor upon any one or more of the foregoing grounds, Subcontractor shall save harmless the Contractor from any and all loss, damage or expense, directly or indirectly suffered by the Contractor from such failure by the Subcontractor, including without limiting the generality of the foregoing, any liquidated damages imposed upon the Contractor and reasonable attorney's fees incurred or paid by the Contractor. If the Contractor, through its own employees or through any contractor or subcontractor of its choice, shall complete the work of Subcontractor pursuant to the provisions of

this paragraph, it may use or permit any such contractor or subcontractor to use all material and equipment of the Subcontractor on the Project at the date of giving such notice.

"The record indicates that Holt paid Fuellgraf $31,231.00 over the A & E subcontract price. Further, Holt paid GESCO $24,500.00 and Harris Electric Supply $250.00 for materials ordered previously by A & E. Finally, Holt received $7,500.00 on a sale of unused materials on the project site. Plaintiffs are awarded $51,789.00, excluding attorney's fees and costs.

### III

"The Court further finds that the actions of Holt did not constitute a breach of the subcontract. As stated previously, Holt properly imposed the bond requirement after the submission of the false invoices. The Court is of the opinion that the approximate forty-day lapse between discovery of the fraudulent invoices and November 28, 1979, the date of the termination letter, was a reasonable period given to A & E to cure the breach.

"Notwithstanding A & E's assurances that it would be able to obtain a bond, Holt was free to terminate the contract in accordance with the subcontract provision, Article VI(a).

"A & E insists that Holt waived its right to terminate the contract and should be barred on the theories of waiver, estoppel, and laches. The basis of the argument is that Holt gave defective notice of the alleged breach, and denied A & E an opportunity to cure.

"This argument must fail under the present circumstances. To waive the breach of contract by A & E, Holt would have had to manifest an intent to do so.[6] The record indicates that Holt maintained its position that A & E would be terminated for submitting fraudulent invoices if the bond were not obtained. The assurances of A & E that it could get the bond provided sufficient basis for reliance on the statement by Holt.[7]

"The Court concludes, therefore, that given Holt's right to terminate for cause under the contract, and the reasonable allowance of forty days to obtain a bond, A & E's attempt to invoke waiver, estoppel and laches must fail.

### IV

"The Court further finds that A & E is not entitled to damages, there being no breach of contract by Holt. The testimony of Don Sheldon, an accountant, was offered by A & E to show that A & E would have earned at least $150,000.00, had it been permitted to finish the job.

"In view of the financial status of A & E when it entered the subcontract agreement and after the termination, the Court is not satisfied that A & E would have enjoyed a positive net worth if it finished the job . . . . Further the record does not reflect payment by A & E to any materials suppliers for which reimbursement is required.

"The Court concludes, therefore, that A & E is not entitled to the damages alleged. (Emphasis supplied.)

---

"[5] Testimony of Ronald Edwards and Walter Edwards.

"[6] *Dallas Glass of Hendersonville, Inc. v. Bituminous Fire & Marine Ins. Co.,* 544 S.W.2d 351 (Tenn.1976).

"[7] See e.g., *J. & J. Electric, Inc. v. Gilbert H. Moen Co.,* 9 Wash.App. 954, 516 P.2d 217 (1973)."

In summation, the chancellor in the original memorandum concisely stated:

The Court concludes that A & E breached the subcontract agreement by submitting fraudulent invoices to support its payment requests. Holt, however, did not breach the subcontract in any way and is entitled to damages as prayed for.

However, after A & E filed its petition to rehear, the trial court in its supplemental

memorandum held as to the Holiday Inn project:

Having reviewed the entire record, including statements of counsel, the Court is of the opinion that the motion for reconsideration is well taken upon grounds Nos. 5 and 9 made by the defendant upon the present motion....

In objection No. 5, the defendant asserts the Court committed error in failing to recognize that Holt breached its contract with A & E in failing to pay any monies to A & E under the contract even though Holt had previously received monies from the owner. Upon review, the Court recognizes the proof on this point is uncontroverted. Indeed, the record shows A & E never paid for work satisfactorily completed on the project.

According to the Holt/A & E subcontract ... A & E was entitled to payment within five days from the date Holt received monies from the owner. Under Article V, clause (a), Holt was to "pay promptly to the subcontractor, following payment by the owner of each monthly request, a sum sufficient so the total payment to the subcontractor shall represent the total value of work completed by it, less the retained percentage." By contract, therefore, A & E was clearly entitled to payment.

McCafferty (then Vice President of Holt Company) stated that up to the date of termination A & E's job performance was satisfactory and that its efforts inured to the benefit of Holt. Further, he acknowledged Holt's failure to pay A & E based on any invoices....

Neither Holt's discovery of A & E's breach of contract nor A & E's subsequent inability to obtain a bond to insure its completion of the project alter A & E's entitlement to payment under the original contract. Further, the record shows Holt received payments on October 11, 1979 ($94,230.00), November 19, 1979 ($46,890.00), and December 4, 1979 ($10,000.00) before the termination of A

& E.... The payments received on Request Nos. 3, 4 and 5 are based on Applications 1, 2 and 3 submitted to W.F. Holt Co. by A & E Company; ...

The Court is of the opinion that A & E is entitled to monies earned and billed for in accordance with revised applications submitted between August 8, 1979 (the date of the original contract) and November 28, 1979 (the date of termination). That is, application No. 1, revised ..., applications 2 and 3 ... in the total amount of $167,813.64.

Further, the Court is of the opinion that A & E should receive $7,500.00 representing the amount received by Holt on sale of materials purchased by A & E which remained on the site after A & E's termination....

In our view, based upon the findings of fact contained in the first memorandum of the trial court, the results embodied therein were correct and the chancellor erred in the legal conclusions reached in the supplemental memorandum. Once the determination was properly made that A & E was in material breach of the subcontract and that the breach was neither waived nor cured (and the record is fully supportive of these findings) there would be no further obligation of Holt to perform under the agreement, that is to pay A & E anything, until the breach is cured. Or stated differently, if A & E was in breach of the contract by submitting fraudulent invoices, as the proof clearly shows, then A & E has no right to rely on the terms of the contract. *Cummins v. McCoy*, 22 Tenn. App. 681, 691, 125 S.W.2d 509, 514–15 (1938). *Continental Casualty Co. v. Irwin Painting & Decorating Co.*, No. 83–43–II (Tenn.App. filed Oct. 6, 1983, at Nashville). Stated yet a third way, A & E's attempt to defraud Holt without question justified termination of the subcontract. Accordingly, Holt was acting within its rights in requiring A & E to meet reasonable conditions to avoid termination, to include obtaining a payment and perform-

ance bond. Until all such conditions were met Holt had no obligation to make progress payments under the subcontract. These requirements were not all met and, as the chancellor originally found, Holt had the right to terminate the contract.

■ For a second reason we believe the chancellor erred in awarding A & E judgment for the amount of its draw requests while allowed to remain on the project. The express terms of the subcontract itself conditioned the obligation to make progress payments on compliance with the subcontract and payment for materials. The record conclusively showed and the chancellor so found that A & E was not in compliance with the subcontract and had made no payments for materials during the period for which progress payments are claimed. Because of the express language of the subcontract permitting Holt to withhold payments resulting from claims for payment of materials, there was no obligation to make progress payments.

■ In ultimately holding that A & E was entitled to recover the progress payments, the chancellor relied on a provision of the agreement that Holt shall "... pay promptly to the Subcontractor, following payment by the Owner of each monthly request, a sum sufficient so the total payments to the Subcontractor shall represent the total value of work completed by it, less the retained percentage." In its supplemental opinion the trial court did not cite or refer to any other provisions of the subcontract, while stating that "[n]either Holt's discovery of A & E's breach of contract nor A & E's subsequent inability to obtain a bond to insure its completion of the project alter A & E's entitlement to payment under the original contract."

We believe this conclusion is erroneous. Not only did the chancellor fail to consider the fact that A & E could not rely on the contract when in breach, the trial court also failed to consider the provisions of the subcontract that set forth how and when payment thereunder will be made. Article III of the agreement provides:

On the last work day of each month following commencement of the work. Subcontractor shall present to Contractor a statement of the work done during said month, which statement, when checked and approved by the Contractor, will be paid within five (5) days after receipt of payment from Owner, *providing progress of the work and payments for labor used and material purchased by Subcontractor have been satisfactory;* provided that Contractor may, at its option on each payment, retain ten (10%) per cent, or such other percentage as shall be specified in the Contract documents, of each estimate until final payment, which shall be made after completion of the work covered by this Contract and written acceptance thereof by the Architect/Engineer, and full payment therefor by Owner. *Provided, however, Subcontractor shall have fully complied with all the provisions of this Contract, and shall furnish evidence, if requested, that all claims for labor, materials and other lienable items of expense have been paid.*

(Emphasis supplied.) The subcontract provides beyond peradventure that before Holt had any duty to make progress payments, A & E "shall have fully complied" with the provisions of the subcontract and shall have furnished evidence, if requested by Holt, that all claims for materials and other lienable items of expense have been paid. Of course, this was simply not the case.

■ A & E argues that Article III did not operate to relieve Holt of the obligation to make progress payments because A & E's work was satisfactory and because A & E could not pay for materials until Holt made the progress payments. This argument, too, must fail because, while A & E's actual work on the project may have been satisfactory, its performance of the subcontract was not satisfactory because A & E failed to comply fully with the conditions of the subcontract. The suspension of the obligation to make progress payment in Article III applies not only when the actual work is unsatisfactory but also when the

subcontractor fails to comply fully with all conditions of the agreement.

■ The chancellor found that A & E breached its subcontract with Holt by submitting falsified, fraudulent invoices in support of its first application for payment. Additionally, the chancellor found that Holt properly imposed a requirement to cure the breach of the agreement that A & E obtain a surety bond to insure its payment and performance of its subcontract agreement. No such bond was ever obtained. In substance, the chancellor held that from the date of the discovery of the attempted defalcation by A & E between October 3 and 5, 1979, until the A & E termination on November 28, 1979, A & E was not in compliance with all the provisions of the subcontract agreement. Because A & E was in breach of the subcontract, Holt had no obligation to make any progress payments to A & E during that entire time period.

■ Yet another specific provision of the subcontract protects the general contractor in this situation. It provides:

If at any time during the progress of the work hereunder Contractor should receive evidence of any lien or claim for material furnished or work performed pursuant to this agreement for which Owner or Contractor may become liable, Contractor shall have the right to retain out of any money then payable or thereafter to become payable to Subcontractor under this agreement, or any other agreement then in effect between Contractor and Subcontractor, an amount sufficient to indemnify it against any such lien or claim.

This record is clear that after the date of the discovery of the falsified invoices by A & E in early October of 1979, Holt was aware that A & E had not paid suppliers for materials delivered to the Holiday Inn project. Obviously, after the defalcation one of the primary considerations of Holt in requiring A & E to obtain a bond was to obtain security for payment of any and all such claims. From that date forward, Holt was entitled under the clear and unambiguous provisions of the subcontract agreement to withhold payments to A & E to indemnify itself against such claims. Without question the last quoted provision is in the subcontract to protect against precisely such a situation as here existed after the breach and to insure that the general contractor and owner are not required to pay both the subcontractor and the subcontractor's suppliers.

■ Moreover, by awarding A & E the total gross amount of progress payments that would have been due had the subcontract originally been performed as written, the chancellor ignored the fact that upon termination Holt and Fuellgraf in fact made payments for materials purchased by A & E for the project directly to the suppliers, thereby relieving A & E of its obligation to do so. Also, under the terms of the agreement, Holt would not have paid A & E for materials in any event. Those payments would have been made by joint check. This was Holt's only original protection from materialmen's lien claims because prior to the breach Holt had allowed A & E to forego the effort and expense of obtaining a bond. Thus, even if A & E were entitled to some damages, and it is not since it was clearly in breach, the total should be based only on the labor provided to the project. For the period in question this amounted to less than $4,500.00.

■ Under all these circumstances Holt's termination of the subcontract was clearly proper and also justified by the specific contract documents.

Article VI(a) of the subcontract provides:

WITH CAUSE. Upon the occurrence of any one or more of the events described hereinbelow and the continuance of same unabated or uncorrected for a period of three (3) calendar days following the giving of written notice of same by the Contractor to the Subcontractor, the Contractor may terminate this Agreement in whole or in part, at its option, and may thereafter, through its own employees or through any contractor or subcontractor of its choice complete the

portion of the work remaining incomplete, and/or remedy or correct any defect of material or workmanship. Termination may be upon one or more of the following grounds:

. . . .

(v) The violation, or omission to perform any provision of this Agreement undertaken by Subcontractor;

The chancellor held that A & E breached the subcontract; that Holt complied with the notice requirement by informing A & E of the breach and providing it a reasonable opportunity to cure its breach; that A & E failed to cure its breach by obtaining a bond; and that therefore Holt was entitled to damages under yet another portion of Article VI(a) of the subcontract, *supra* at p. 728. The chancellor found that A & E had notice of the conditions. Ronald Edwards, President and Director of A & E, admitted those facts. Any findings in that regard which may be disputed by A & E depend upon the chancellor's weighing of the credibility of witnesses' testimony. In that event such findings are entitled to great weight. *Capital City Bank v. Baker*, 59 Tenn.App. 477, 493, 442 S.W.2d 259, 266 (1969). The evidence in this record is more than supportive of these factual findings and we concur with the chancellor in that respect.

Because the contract was properly terminated with cause on November 28, 1979, A & E became obligated at that time pursuant to Article VI(a) of the subcontract to hold Holt harmless from all costs of completion in excess of the original subcontract price. Thus, even assuming Holt had made the progress payments, A & E would have been obligated to return the amounts previously paid by Holt because the cost of completion ultimately exceeded the subcontract price.

The chancellor's amended judgment in favor of A & E in the amount of the progress payments has the effect of requiring Holt to pay for all materials included in the progress billing twice, once by payment directly to the material suppliers and a second time by payment to A & E. A & E

would clearly receive a windfall in the amount of the cost of materials if this judgment were allowed to stand. For the record is clear that A & E did not pay for these materials.

A & E insists that Holt's claim is barred by waiver, estoppel or laches.

As was the case with the chancellor, we find no basis to indicate that Holt had waived the breach, or that the doctrines of estoppel or laches bar recovery.

We deal first with the waiver argument. "A waiver is the voluntary relinquishment of a known right and is established by express declarations or acts manifesting an intent not to claim the right." *Tennessee Asphalt Co. v. Purcell Enterprises, Inc.*, 631 S.W.2d 439, 444 (Tenn. App.1982); *Dallas Glass v. Bituminous Fire & Marine Ins. Co.*, 544 S.W.2d 351, 354 (Tenn.1976). *See also Baird v. Fidelity-Phenix Fire Ins. Co.*, 178 Tenn. 653, 665, 162 S.W.2d 384, 389 (1942). A & E urges waiver because after Holt had knowledge of the breach it did not tell A & E to stop working and accepted benefits under the contract. In asking that we reverse the chancellor's express finding that no waiver occurred A & E relies on the statement found in 17 Am.Jur.2d *Contracts* § 447 (1964) that "acceptance of the benefit under a contract with knowledge of a breach thereof ordinarily constitutes a waiver of the wrong." When placed in full context we have no disagreement with the law there enunciated. The fuller citation reads in appropriate part:

The acceptance of the benefit under a contract with knowledge of a breach thereof ordinarily constitutes a waiver of the wrong. *However, mere efforts on the part of an innocent party to persuade the promisor, who repudiates his agreement, to reject that repudiation and proceed honorably in the performance of his agreement have been held not to involve a waiver of the innocent party's right to avail himself of the breach after the efforts finally prove unsuccessful. Moreover, it has been held that the fact that a party did not act*

upon a breach but negotiated with the other party for a new contract does not constitute an acquiescence in the breach where such action was induced by misrepresentation by such other party. A defendant is precluded from claiming a waiver of breach of contract where he fraudulently induces the plaintiff to permit him to continue and thereafter violates the promises he made to induce the plaintiff to give such permission.

17 Am.Jur.2d *Contracts* § 447 (1964) (footnotes omitted) (emphasis supplied). This view is supported by cases from other jurisdictions. *See, e.g., J & J Electric, Inc. v. Gilbert H. Moen Co.,* 9 Wash.App. 954, 516 P.2d 217 (1973); *cf. Hartung v. Pollastrini,* 147 Cal.App.2d 88, 304 P.2d 846 (1956).

In *J. & J. Electric* a general contractor gave an electrical subcontractor notice of termination. When the subcontractor assured the general contractor that full performance would be forthcoming, the general contractor was induced not to carry through with the termination. Later when the assurances were not fulfilled by the subcontractor, the general contractor terminated the contract without further notice. The court held that the general contractor, induced not to terminate by the false assurances of the subcontractor, did not waive its right to terminate for the grounds set forth in its original notice. 516 P.2d at 222–23.

In the instant case the record reflects and the chancellor found that Holt did not terminate the subcontract in October because A & E assured Holt that it could and would obtain the required surety bond. The chancellor specifically found that "[t]he assurances of A & E that it *could* get the bond provided sufficient basis for reliance on the statement by Holt." The chancellor also found that Holt permitted A & E a reasonable opportunity to obtain such a bond. Holt did not force A & E to continue with the project. However, it did require A & E to meet the construction schedule while it remained on the job and sought to post a bond. We do not believe that Holt's actions, which were induced by

A & E, in permitting A & E a reasonable opportunity to cure its breach amounted to a waiver of its right to terminate A & E when it failed to perform the condition to cure that was imposed. Mr. McCafferty and Mr. Holt both testified that at the meeting with Walter Edwards on or about October 19, 1979, Mr. Edwards was told the conditions under which A & E could cure its breach and continue on the project and further that no payments would be made to A & E until A & E obtained the surety bond insuring the performance by A & E of its subcontract obligations. The chancellor found that A & E agreed to those conditions. At trial Walter Edwards in effect admitted A & E's agreement that it would not be paid until it had provided the surety bond:

Q. And you knew if you didn't get that bond you weren't going to get paid, didn't you, Mr. Edwards?

A. I knew that bond was going to expedite payment.

A & E's understanding and agreement to the withholding of progress payment by Holt was further evidenced by A & E's failure to make any demands on Holt for payment. Throughout the testimony of Walter and Ronald Edwards, the Chairman of the Board and President of A & E, respectively, no proof was provided of any demand, written or oral, made on Holt to make progress payments. Nor was there testimony that A & E advised Holt that it was in breach of its contractual obligations because it refused to make progress payments. According to James F. Holt, Jr., plaintiff's President, he talked to Walter Edwards on some 20 occasions regarding the furnishing of bond. Yet there is no indication of any request for payment ever being made. The only reference in the testimony to any inquiry by an A & E official regarding when it would be paid was a question Mr. Edwards testified that he asked at the first meeting with Mr. Holt and Mr. McCafferty.

A. I'm sure the first time I met with him after the problem arose. I asked him when we could expect money.

Q. And what did he say?

. . . .

A. Work it out.

Q. He says to you, work it out?

A. He said we're working it out. We're working on it. As soon as we can. Something to that effect, yes, sir.

Q. That's all he said?

A. Yes, sir.

To use the colloquial, the whole tenor of this record is that from and after the time A & E was "caught with its hands in the cookie jar" in early October until its termination some six weeks later it was "walking on eggs" and being careful not to further offend Holt in hopes that its problem would disappear, either by being able to obtain the bond or getting so far along with the work that Holt would withdraw the requirement therefor. Of course, this would be the sensible thing to do. Had A & E made any demands upon Holt for payment or anything else at any point after the breach was discovered, the logical result would have been an earlier dismissal.

In fact, A & E made no allegations whatsoever that Holt's failure to make progress payments breached the subcontract agreement until long after Holt had terminated the subcontract for A & E's breach and failure to cure within a reasonable time. Specifically, the first claim of record that Holt's non-payment amounted to a breach came in the amended counterclaim filed on the eve of trial. The previously recited provisions of the contract regarding payment, A & E's agreement that Holt would not make progress payments until A & E obtained a bond, and A & E's failure timely to object or declare the subcontract in breach because of Holt's refusal to make progress payments would all bar A & E's claim for damages caused thereby under the doctrine of waiver.

Moreover, we are satisfied that the doctrine of estoppel is of no assistance to A & E.

 Estoppel requires at a minimum (1) reliance upon the statement or actions of another without the opportunity to know the truth, and (2) action based on that reliance which results in detriment to the actor. *Warren Brothers Co. v. Metropolitan Government*, 540 S.W.2d 243, 247 (Tenn.App.1976). For one to be equitably estopped, that party must have taken actions "calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert." *McClure v. Wade*, 34 Tenn.App. 154, 171, 235 S.W.2d 835, 842 (1950).

A & E contends that it continued to work on the Holiday Inn project in reliance upon Holt's actions which led A & E to believe that its contract remained "in full force and effect."

 Given that Holt, based on A & E's request and assurance, postponed termination pending the posting of a bond, it is understandable that while A & E remained on the job Holt would urge A & E to adhere to its construction schedule. At no point, however, did Holt abandon its position that A & E would be terminated unless a bond was obtained. As the chancellor found, "Holt told A & E that it could remain on the project, *provided* it obtained a bond;" and further, "[t]he record indicates that Holt maintained its position that A & E would be terminated ... if the bond were not obtained." A & E remained aware of the conditions and accepted them.

In short, the chancellor's findings reflect that A & E did not continue to work on the project in reliance upon any actions or manifestations of Holt which led A & E to believe Holt had waived any rights arising from A & E's breach. Rather, its continued presence was the result of A & E's own decision to attempt to remain on the job and to induce Holt to allow it a reasonable opportunity to cure its breach. This could be done only by obtaining a bond to protect Holt from any potential future defalcations. There is no basis for estoppel under these facts.

A & E also attempts to assert the doctrine of laches. Likewise, we do not believe this defense is available to it.

The essential elements of laches are (1) the negligence and unexcused delay of the complainant in asserting his alleged claim and (2) injury to the rights of another intervening during and therefore on account of the delay. *Bernard v. Walker*, 186 Tenn. 617, 629, 212 S.W.2d 600, 605 (1948). The chancellor found and the record is clear that promptly after discovery of A & E's attempted defalcation, Holt notified A & E of both the breach and the conditions by which it could cure its breach and avoid termination. Some six weeks later on November 23, 1979, when it was clear A & E could not obtain a bond, Holt terminated A & E's subcontract. The instant suit was filed on December 6, 1979.

In our view, Holt did not delay in asserting any right. The most that can be argued by A & E is that Holt permitted A & E more than adequate time to obtain a bond. This delay, however, was based on the repeated assurances of A & E that it would and could obtain a bond and was for the benefit of A & E. It clearly cannot be said to have prejudiced A & E. The doctrine of laches is inapplicable.

In the last analysis of the Holiday Inn dispute we believe that based on the findings of fact of the trial court its original judgment (except for the computation error) was correct. In view of our holding that because of A & E's breach there was no obligation for Holt to make the contested progress payments it is unnecessary to consider any other issues raised by either party as to this project.

## THE GRESHAM AND SMITH DISPUTE

The trial court did not address the Gresham and Smith dispute in its original memorandum opinion. After this was brought to the court's attention, the chancellor in the supplemental opinion ruled that:

> In objection No. 9, the defendant contends the Court erroneously failed to address the issue of damages suffered by A & E with regard to the Gresham/Smith contract. Defendant insists it is entitled to recover either on breach of contract principles or on the basis of *quantum meruit.*
>
> The Court agrees defendant should recover on the basis of *quantum meruit.*
>
> According to James F. Holt, President of Holt Company, A & E attended approximately twelve planning meetings and worked up an estimate on project costs. Moreover, he stated A & E was the only electrical contractor invited to participate in the project. His testimony was in keeping with that of Walter Edwards, who stated that while A & E and Holt had no written contract, A & E was promised the job. This promise became the catalyst for A & E's attending meetings, working up an estimate, and so forth. It appears A & E reasonably expected to receive the job. The totality of circumstances suggests and the Court concludes A & E may recover $7,000.00, the value of its services toward the Gresham/Smith project. *See, e.g., Paschall's, Inc. vs. Dozier*, 219 Tenn. 45, 407 S.W.2d 150 (1966) for a discussion of the elements of *quantum meruit:* a benefit conferred upon the defendant by plaintiff, appreciation by the defendant of such benefit, and *acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit* without payment of the value thereof.

(Emphasis supplied.)

Holt asserts that A & E was not entitled to recovery in *quantum meruit.* We agree.

The proof reflects that during the summer of 1979 Holt negotiated with the owner to construct the Gresham and Smith building on West End Avenue in Nashville. In so doing Holt contacted various subcontractors and asked them to work with Holt on such a negotiated bid to attempt to come within the owner's budget and obtain a contract to construct the building. A & E was contacted with the original intention that it would become the electrical subcontractor on the "negotiated project" if it materialized and if the A & E price was satisfactory. A & E attended one or two

meetings a month regarding the job and prepared an estimate of cost. Generally, but not always, on "negotiated" work, if Holt is awarded the contract, the subcontractors who help prepare the estimates are awarded subcontracts if their price is in line. Neither Holt nor any other general contractor on such work is obligated in any way to award a contract to a particular subcontractor in the usual course of this process. Subsequent to the Holiday Inn dispute Holt was given a negotiated contract on the Gresham and Smith building, presumably after the electrical subcontract prices prepared by A & E were used by Holt. A & E was not awarded a contract on the Gresham and Smith project for the stated reason that it was not then financially stable and could not obtain a bond. Though not specifically said, implicit in the refusal of Holt to award the subcontract was the existence of the Holiday Inn disagreement and how it came about.

The chancellor concluded that A & E was entitled to recover damages from Holt on the Gresham and Smith project under the theory of *quantum meruit* for prefatory work done by A & E under an "assumption" that it would be awarded a subcontract to construct the electrical portion of the work. In so doing, the chancellor relied on testimony of Walter Edwards and James F. Holt, Jr., who both testified that Holt originally intended to give A & E the electrical portion of the project if Holt was awarded the construction contract. However, Mr. Holt stated that even his original intention was premised on A & E developing a contract price within the budget for the project. A & E's work on the Gresham and Smith project was all preliminary. The prices presented by A & E were not approved or agreed to by the owners or architects. Mr. Edwards acknowledged such a limitation and in effect admitted his understanding that no general contractor on negotiated work has any legal obligation to award a subcontract to any subcontractor who might have submitted price estimates and/or worked with the architect or owner on such a project. Such an understanding in the construction trade was verified by

William F. Somers, a vice president of Fuellgraf. Significantly, Mr. Somers testified without contradiction that it was industry practice that a negotiated subcontract is awarded and becomes legally binding only after the owner and general contractor finalize their agreement. Mr. Somers further testified that subcontractors very often negotiate for a project and fail to obtain a subcontract; further, that all preliminary work and estimating is done with the understanding it will not be billed and that it may not result in the subcontractor being awarded a contract.

The elements of recovery in *quantum meruit* or quasi contract as recognized by the chancellor are succinctly stated in *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150 (1966). In reiteration these are:

A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and *acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit* without payment of the value thereof.

219 Tenn. at 57, 407 S.W.2d at 155 (emphasis supplied). However, under Tennessee law:

[A] promise to pay will only be implied when the work was performed under circumstances in which *a person could reasonably expect to be compensated by the party benefited.* The conduct or words of the person who receives the benefit of this work must be such that one could fairly infer a promise to pay. *See, e.g., Nashville Breeko Block and Tile Co. v. Hopton*, 29 Tenn.App. 394, 196 S.W.2d 1010 (1946).

*V.L. Nicholson Co. v. Transcon Investment and Financial Ltd.*, 595 S.W.2d 474, 482 (Tenn.1980) (emphasis supplied).

There is no evidence in this record that in the ordinary course of business subcontractors who assist a general contractor in bidding a negotiated job expect to be paid for their efforts in the event the general contractor elects not to award them the subcontract. In fact, the only evidence in this

record is that the custom in the industry is to the contrary. Moreover, A & E has cited no legal authority recognizing a right to recover in *quantum meruit* in a factual situation similar to the instant case.

We think the evidence regarding the custom in the industry and Mr. Edward's admission of his understanding that Holt had no legal obligation to award A & E the subcontract or to pay for the preliminary work A & E performed in hope of obtaining a subcontract is crucial.

 To hold that a subcontractor is entitled to compensation in *quantum meruit* for its efforts in assisting a general contractor prepare a price on a negotiated project would unfairly hamstring general contractors and owners who desire to negotiate construction contracts and to solicit proposals from subcontractors. We believe the correct view embodied in existing custom in the industry is that the efforts of subcontractors in such situations merely represent attempts to obtain business and the costs incurred by the subcontractor are merely costs of doing business which may or may not result in the subcontractor obtaining a contract. *Cf. Hood v. Gillespie*, 190 Tenn. 548, 230 S.W.2d 997 (1950).

In *Hood v. Gillespie* the owner of property was entitled to terminate an agreement with a real estate broker because the contract did not legally obligate the owner to accept the fruits of the broker's efforts and sell the property. The court then denied the broker's *quantum meruit* claim. In discussing the hardship such a ruling caused the broker, the court stated:

> It is true that the sale by the owner, or withdrawal from the market, works a hardship upon the agent who has gone to considerable expense in promoting a sale of the property. But the agent spends that money and devotes his efforts in the hope of making a sale, and thus earning the commission. *It is a chance of losing which all real estate brokers take in undertakings of this kind unless their agency contract protects them.*

190 Tenn. at 559, 230 S.W.2d at 1001 (emphasis supplied).

The instant case is not dissimilar in our view. Here there was no legal obligation upon Holt to award the subcontract to A & E and the principals of A & E knew that when the preparatory work was performed. Historically, the essence of the construction industry has centered around "risk-taking." We believe the risk element to be no different in the contractor-subcontractor relationship in the "negotiated work" process, absent an express agreement to the contrary which is not here present.

 An essential element of a *quantum meruit* claim beyond the mere conferring and accepting of a benefit is that *the retention of the enrichment be unjust.* See, e.g., Restatement of Restitution § 1 Comment (c); *Paschall's, Inc.*, 219 Tenn. at 57, 407 S.W.2d at 155. There is no general rule that a recipient of a benefit must pay for the benefit conferred upon him by claimant irrespective of the circumstances. *Paschall's Inc.* makes that very clear. *See also Bloomgarden v. Coyer*, 479 F.2d 201, 210–12 (D.C.Cir.1973), where the court held that the plaintiff was not entitled to the award of a *quantum meruit* "finders fee" as a compensation for services benefiting defendant where such services were rendered not with expectation of compensation but in an effort to promote business with the defendant; and *Rutledge v. Housing Authority*, 88 Ill.App.3d 1064, 44 Ill.Dec. 176, 179–180, 411 N.E.2d 82, 85–86 (1980), where services provided during negotiation of a turnkey project were not compensable when there were known contingencies precedent to letting of the contract.

The foregoing principle is stated with clarity in the most recent draft of the Restatement (Second) of Restitution.

> A person whose conduct in negotiating for a gain or advantage results in a benefit to him and a loss or expense to another may be unjustly enriched by the benefit if, in the absence of compensation to the other, the conduct appears unconscionable in purpose or effect. *No account is taken of uncompensated loss or expense in this connection if it re-*

*sults from a risk fairly chargeable, as between the parties, to the person who bears it.* Such loss or expense is taken into account only if it was foreseeable by the person receiving the benefit.

Restatement (Second) of Restitution § 6(2) (Tentative Draft No. 1983) (emphasis supplied).

■ We cannot extend the doctrine of *quantum meruit* to hold that a subcontractor may recover thereunder when there is no express agreement and no custom in the trade that if the subcontract is not awarded upon the general contractor obtaining the work that the subcontractor will be paid whatever is the value of the benefit conferred upon the general. We believe, as was the case with the real estate broker in *Hood v. Gillespie,* that this must simply be treated as a risk of the subcontracting business. Restatement (Second) of Restitution § 6(2) (Tentative Draft No. 1983). In final amplification we quote from the comments to the proposed Restatement:

> A claim to restitution is sometimes made by a person who has conferred a benefit on another in a process of negotiations between them ... when the parties have ultimately failed to reach an agreement.... [W]hen the person against whom restitution is claimed cannot be charged with a violation of duty, and no agreement has been concluded between the parties, the fact that one of them has gained by the course of bargaining does not alone signify he is unjustly enriched.... *The participants in a process of negotiation regularly understand that each must be on guard against the other; they are often aware that burdensome effort and outlay on one side is placed at risk. If it induces the other party to contract with the venturer, he may reap a correspondingly large gain; if not, he must hope for success in another negotiating process. The assumption of risk is sometimes explicit, sometimes an aspect of the line of business concerned (analogous to a usage of trade),* and sometimes

implicit in the arms-length relation between the parties.

*Id.* Comment (b) (emphasis supplied). Therefore, the *quantum meruit* theory of A & E must fail.

In view of the holdings previously contained herein it is unnecessary to address any of the other issues raised by either party to this appeal.

Accordingly, the judgment of the chancellor awarding any damages to A & E from Holt is reversed. As the chancellor quite properly ruled throughout, Holt is entitled to a judgment against A & E for $48,481.00, representing the corrected amount of Holt's damages as a result of A & E's breach on the Holiday Inn project. However, there is no entitlement to set-off against this amount to A & E. This cause is remanded for such further proceedings as may be necessary consistent with this opinion. The costs are taxed against A & E.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

TODD, P.J. (M.S.), and LEWIS, J., concur.