IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 1, 2023

# IN RE A.H. ET AL.[1]

**Appeal from the Circuit Court for Macon County**
**No. 2021-CV-81      Michael Wayne Collins, Judge**

_____

## No. M2022-01066-COA-R3-JV

_____

This is a dependency and neglect case predicated on an allegation of severe abuse. The juvenile court adjudicated the children dependent and neglected and found that one of the children had been subject to severe child abuse at the hands of the children's father. The father appealed to circuit court. After a de novo hearing, the circuit court found the allegations of severe abuse were not substantiated by clear and convincing evidence and declined to find the children dependent and neglected. The Department of Children's Services, the children's guardian ad litem, and the children's mother appeal, arguing that the circuit court erred in concluding that the evidence of severe abuse was not clear and convincing. Based on our review of the entire record, we find there was not clear and convincing evidence to support a finding of severe abuse. Therefore, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Victoria J. Grelle, Livingston, Tennessee, guardian ad litem, for the appellants, A.H. and D.H.

Zach Taylor, Hartsville, Tennessee, for the appellee, Acardio H.

Lisa C. Cothron, Lafayette, Tennessee, for the appellee, Michelle B.

Jonathan Skrmetti, Attorney General and Reporter, Andrée Blumstein, Solicitor General, and Amber L. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

_____

[1] The first and last names of the children have been initialized to protect the identity of the children.

**OPINION**

FACTUAL AND PROCEDURAL HISTORY

This case involves an allegation of sexual abuse against a five-year-old child's father. Michelle B. ("Mother") and Acardio H. ("Father") are the unmarried parents of two children, A.H. ("the child") (born in 2014) and D.H. (born in 2016). Pursuant to a permanent parenting plan, Mother was the primary residential parent, and Father exercised 100 days of parenting time each year with the children.

On September 18, 2020, the Tennessee Department of Children's Services ("the Department" or "DCS") filed a petition in the Macon County Juvenile Court ("juvenile court") asking the court to find the children dependent and neglected and alleging A.H. was the victim of severe child abuse. In its petition, the Department alleged:

> On September 9, 2020 the department received a referral alleging sexual abuse of [A.H.] by his father, . . . A forensic interview was completed on September 16, 2020 with [A.H.]. In the interview, [A.H.] disclosed two incidents of sexual abuse by his father. [A.H.] said that he and his brother, [D.H.], were sleeping in the bed with their father. His father put his penis against [A.H.'s] anus and in between his "but[t] cheeks." [A.H.] described his father's penis in that it "pops up like when a guy sees a girl." [A.H.] said that his father's penis did not go all the way inside him and that it felt "terrible." [A.H.] also demonstrated what happened to him by putting his pointer finger of one hand through a circle of fingers on the other hand. [A.H.] also used an anatomical drawing to indicate that his father's penis went into his anus. [A.H.] pretended to be asleep when this happened.

On that same day, the juvenile court entered an ex parte restraining order preventing Father from having any contact with the children. After a hearing on July 9, 2021, the juvenile court entered an order finding clear and convincing evidence that A.H. "is a victim of severe child abuse" perpetrated by Father and that the children were dependent and neglected. Father appealed to the Macon County Circuit Court ("circuit court").

The circuit court held a de novo hearing on May 27, 2022. The Department presented the testimony of four witnesses: Cece Ralston, forensic interviewer at the 15th Judicial District Child Advocacy Center in Lebanon, Tennessee; Jeffery Scott Herman, senior psychological examiner and licensed professional counselor; Kasi Hire, DCS Investigator; and Father.[2] After DCS concluded its case in chief, Father moved for a

---

[2] We will summarize the witnesses' testimony below, as relevant to the issues on appeal.

"directed verdict,"[3] which the circuit court granted. The circuit court entered an Adjudication and Final Disposition Hearing Order ("Final Order") on July 7, 2022 granting the directed verdict, dismissing DCS's petition, and determining that the allegation of severe abuse was not supported by clear and convincing evidence. The circuit court based its decision on an adverse credibility finding regarding the child:

> 23. As to the child's credibility, the Court does not find that the child was lying, but that what the child testified to does not make him credible. Whether it is his age, his memory, or the situation, the Court does not find that the allegations lined up with the facts, or lined up with the circumstances, or lined up with the passage of time. The Court does not find that to be believable.
> 24. The Court notes that it would be stretching to find the case otherwise, and to get there would mean to accept that these experts say this is what he said, even though the experts do not know exactly what it meant, but that he did say this. The Court notes that there are a lot of important details that were left out about being awake, asleep, having clothes on or off, and because of that, the Court finds it odd. The Court asks why would those questions not be asked, and the Court does not know the answer to that.

The circuit court further reasoned: "It is inconceivable to the Court that if the event did happen that the child did not react or did not say anything, and the Court cannot align those facts with the reasoning to reach clear and convincing evidence that this event occurred to this child." The children's guardian ad litem, the Department, and Mother appeal the circuit court's Final Order asserting that the circuit court erred in granting Father's motion for directed verdict because the evidence clearly and convincingly established severe child abuse and dependency and neglect.

STANDARD OF REVIEW

At the close of the Department's proof, Father orally moved for a "directed verdict," which the circuit court granted after finding that DCS, "did not meet the burden of proof by clear and convincing evidence." The proceeding was a bench trial; thus, Father's motion was more appropriately categorized as a motion for involuntary dismissal under Tenn. R. Civ. P. 41.02(2). *See McAdams v. McAdams*, No. E2019-02150-COA-R3-CV, 2020 WL 4723762, at *2 (Tenn. Ct. App. Aug. 13, 2020) (noting that "a motion for a directed verdict has no place in a bench trial while a motion for involuntary dismissal has no place in a jury trial."). Despite this discrepancy, we will proceed to analyze the trial court's order as if it were an order granting an involuntary dismissal under Tenn. R. Civ. P. 41.02(2). *See In re Jonathan S., Jr.*, No. M2016-01365-COA-R3-JV, 2017 WL

---

[3] As will be discussed in more detail below, Father's motion was actually a motion for involuntary dismissal under Tenn. R. Civ. P. 41.02(2) because the proceeding was a bench trial rather than a jury trial.

3149600, at *5 (Tenn. Ct. App. July 24, 2017) (stating that, "[d]espite the differing methods of analysis associated with the two motions, a trial court's grant of a motion for a directed verdict in a bench trial does not necessarily require reversal on appeal").

In ruling on a motion for involuntary dismissal under Tenn. R. Civ. P. 41.02(2), a trial court "may 'impartially weigh the evidence as though it were making findings of fact and conclusions of law after all the evidence has been presented.'" *In re Jonathan S., Jr.*, 2017 WL 3149600, at *4 (quoting *Bldg. Materials Corp. v. Britt*, 211 S.W.3d 706, 711 (Tenn. 2007)). As for this Court's duty when reviewing a trial court's decision on a Tenn. R. Civ. P. 41.02(2) motion, we have explained:

> "This court uses the familiar Tenn. R. App. P. 13(d) standard to review a trial court's disposition of a Tenn. R. Civ. P. 41.02(2) motion because the trial court has used the same reasoning to dispose of the motion that it would have used to make a final decision at the close of all the evidence. Thus, we must review the record on appeal de novo with a presumption that the trial court's findings are correct. We will affirm the trial court's decision unless the evidence preponderates against the trial court's factual determinations or unless the trial court has committed an error of law affecting the outcome of the case. We give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses."

*Id.* at *5 (quoting *Burton v. Warren Farmers Co-op*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002) (internal citations omitted)).

Because the trial court must use the same reasoning to dispose of a motion for involuntary dismissal under Tenn. R. Civ. P. 41.02(2) as it would have used to make a final decision at the close of all the evidence, we must consider the evidentiary standard required for resolution of a petition for dependency and neglect and severe child abuse. As we have explained:

> The fact a child is dependent and neglected and the fact a parent has engaged in severe child abuse must be established by clear and convincing evidence. Tenn. Code Ann. § 37-1-129(c); *Tenn. Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005) (holding that despite the lack of a statutory requirement that severe child abuse be shown by clear and convincing evidence, due to the consequences of such a finding the clear and convincing standard must be applied). For the evidence to be clear and convincing, the evidence must eliminate any serious or substantial doubt about the correctness of the

conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007); *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

*In re Angelleigh R.*, No. M2020-00504-COA-R3-JV, 2021 WL 1994033, at *6 (Tenn. Ct. App. May 19, 2021).

Our Supreme Court has recently reiterated the two-step process trial courts must employ when applying the clear and convincing standard:

[T]rial courts apply this standard in a two-step process, distinguishing between the individual underlying facts and the aggregate of those facts:

Under the clear and convincing evidence standard, it is important to distinguish between the specific facts found by the trial court and the combined weight of those facts. Each specific underlying fact need only be established by a preponderance of the evidence. [. . .] Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse. *In re S.J.*, 387 S.W.3d 576, 591-92 (Tenn. Ct. App. 2012) (internal citations and some quotation marks omitted).

After the trial court finds the individual underlying facts by a preponderance of the evidence, it then considers whether "the combined weight of those facts . . . amount[s] to clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d [533, at 555–56 (Tenn. 2015)] (citing *In re Adoption of Kleshinski*, [No. M2004-00986-COA-R3-CV,] 2005 WL 1046796, at *17 [(Tenn. Ct. App. May 4, 2005)]).

- 5 -

*In re Markus E.*, No. M2019-01079-SC-R11-PT, --- S.W.3d ---, 2023 WL 3557708, at *13 (Tenn. May 19, 2023). Our Supreme Court went on to explain the process for appellate review under the clear and convincing evidence standard:

> To review trial court decisions, appellate courts use a similar two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240, 246 (Tenn. 2010)].

*In re Markus E.*, 2023 WL 3557708, at *13-14.

## ANALYSIS

The Department, Mother, and the children's guardian ad litem insist that the trial court erred in determining that the Department failed to present clear and convincing evidence that A.H. is the victim of severe child abuse perpetrated by Father and that the children are dependent and neglected. We begin by addressing the issue of severe child abuse.

Tennessee Code Annotated section 37-1-129(b)(2) states that, "If the petition alleged the child was dependent and neglected as defined in § 37-1-102(b)(13)(G) . . . the court shall determine whether the parents or either of them or another person who had custody of the child committed severe child abuse." The definition of "severe child abuse"[4] includes, among other things, the commission of "aggravated sexual battery" against a child. Tenn. Code Ann. § 37-1-102(b)(27)(C); Tenn. Code Ann. § 39-14-504. "Aggravated sexual battery" includes "unlawful sexual contact with a victim by the defendant" when "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-14-504(a)(4). Pursuant to Tenn. Code Ann. § 39-13-501(6), "sexual contact" includes:

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts,[5] or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

Based on this definition of severe child abuse, we must determine whether there is clear and convincing evidence that Father intentionally touched his intimate parts (whether clothed or unclothed) to his son's intimate parts (whether clothed or unclothed) for the purpose of sexual arousal or gratification. In this case, the evidence consists of disclosures A.H. made to various individuals and the testimony of expert witnesses regarding those disclosures; there is no evidence that there was an eyewitness to any abuse, and no physical evidence was presented to substantiate the child's allegations. The lack of eyewitness testimony and physical evidence is not fatal to the allegations of abuse because, as this Court has aptly held, a child's statements regarding sexual abuse "are not rendered

---

[4] There are significant repercussions that extend from a finding of severe abuse:

> The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. Tenn. Code Ann. § 37-1-130(g)(4) ("the parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court.") The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.

> [*DCS v.*] *M.S.*, 2005 WL 549141, at *10. Thus, if there is a finding of severe child abuse, under the statutes, DCS is relieved of the obligation to use reasonable efforts to reunify the child with the parent, it is more difficult for the parent to regain custody, and one ground for termination of the parent's parental rights is effectively established.

*In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011).

[5] "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Tenn. Code Ann. § 39-13-501(2).

untrustworthy simply because there was no eyewitness to the abuse, and no physical evidence to confirm that it occurred." *In re Madison M.*, No. M2013-02561-COA-R3-JV, 2014 WL 4792793, at *14 (Tenn. Ct. App. Sept. 25, 2014). Moreover, we have recognized that:

> [S]tatements by a young child, made over a period of time to different people under circumstances and in situations that were not unduly suggestive or directive regarding sexual abuse by an adult, may constitute clear and convincing evidence that the child was sexually abused, especially when coupled with the exhibition of sexualized behavior and the development of psychological and emotional problems[.]

*In re Melanie T.*, 352 S.W.3d 687, 702 (Tenn. Ct. App. 2011). The relevant testimony at trial is summarized below.

CeCe Ralston testified as an expert in forensic interviewing and testified that she interviewed A.H. for approximately one hour on September 16, 2020.[6] She explained that she had worked for forty years in children's mental health services and had conducted over 1,600 forensic interviews. At the beginning of her interview with A.H., she set out guidelines for their conversation, and she explained to A.H. the importance of only talking about "things that were real and true." Ms. Ralston believed A.H. appreciated the importance of being truthful in the interview. Ms. Ralston engaged in a "rapport building phase" with A.H. and, when discussing his family members, A.H. disclosed the incident that occurred with Father. Ms. Ralston described A.H.'s disclosure as follows:

> A. What [A.H.] said to me was that his father had penetrated him. He told me in English, in words, that he said that his part went into his butt, I believe is what he said, but he also drew a picture of it. He demonstrated with his hands. He talked about his father's part and he made a circle. He said "that went into my part, my butt."
> Q. When you mean "it," what are you referring to?
> A. Penis. And he pointed to the area that he was talking about. I said -- he used a Spanish word which I have a hard time pronouncing. I think it was "wawoosh" (phonetic) or something like that, referring to that, but he pointed to his crotch area to show me where he meant about the part of his father's that went into his butt. As I said, he said, "This part," he used his finger and he made a circle with his other hand, and he said, "went in my butt." "This is my dad. It went in my butt." He drew a picture of it, very detailed, and told me again, "This part of him went into here, into my butt."
> Just to make sure I knew what we were talking about specifically, I also showed him an anatomical drawing of a preschool age or a pre-teenage

---

[6] Ms. Ralston also interviewed D.H.; he did not make any disclosures of abuse.

Hispanic male. I said, "Show me which part of your dad you're talking about went where." He pointed to the penis. He said that's the part of his dad's. He pointed to the butt and the anus and he said, "That's where it went."

She stated that A.H. laughed "a little bit . . . from perhaps embarrassment" at some points in the interview, but she explained that it is "not unusual for children to sometimes laugh during an interview when they're even talking about terrible things." A.H. did not talk with Father about what happened because, in his words, "I didn't want him to know that I knowed. He'll get mad, very mad." Ms. Ralston asked A.H. to draw a picture of "what happened," and A.H. drew a rudimentary picture of Father and himself. Ms. Ralston asked A.H. to label the drawing and, when she pointed to the figure that represented Father, A.H pointed to the body part between Father's legs and explained, "this goes into the butt." Further below, there were two additional smiling stick figures drawn by A.H., and Ms. Ralston labeled the figures as A.H. and Father with the notation "when we woke up" underneath the figures.

Regarding the consistency of A.H.'s statements during the interview, Ms. Ralston stated:

> This child one thing that was significant about this interview was I can't think of any other child that I've ever interviewed who told me so consistently in so many ways the same story. He said verbally, he demonstrated with fingers, he drew the picture, he identified on the picture, and it was consistent throughout.

Ms. Ralston testified that A.H. described Father as "very crazy" and stated to her that Father had "threatened to kill [Mother]" after A.H. accidentally fell and broke his arm while he was with Mother and her boyfriend. A.H. also stated that Father shoots guns around kids. The child explained that Father shoots pumpkins and watermelons but that it "looks like he's aiming [the guns] at kids." A.H. stated that his Father makes A.H. and D.H. take showers with him even though A.H. did not want to shower with Father. Ms. Ralston asked A.H. how he felt when Mother told him he did not have to go back to visit with Father, and he stated, "I think it's happy because I don't want to go back with him." A DVD recording of Ms. Ralston's forensic interview of the children was entered into evidence as Exhibit 3 without objection.

Next, Jeffery Herman testified as an expert in mental health diagnosis and treatment of children. He testified regarding his interview of A.H. on July 8, 2021, approximately ten months after the forensic interview. Mr. Herman conducted a series of assessments on A.H. and screened him for emotional conditions and intelligence. A.H. tested "well within normal limits" on his IQ screening. Mr. Herman gave A.H. an outline of a human figure and then provided color codes "where yellow stands for happy, blue for sad, red for angry, and green for worried or scared." A.H. associated the color red with Father. Mr. Herman

asked why A.H. associated feelings of anger with Father, and he stated, "He does a lot of mean stuff to me" like "pinch[ing]" and "whack[ing] [me] with some random sticks." Through follow-up questioning, Mr. Herman determined A.H. was referring to "pretty age typical discipline." When asked how he felt about visiting Father, A.H. said "not happy." Mr. Herman further described the child's unhappiness as follows:

> I asked why he feels that way, and he replied, "After one thing happened, I just don't like it." I asked what happened. He told [me], "I get embarrassed." I took some time to explain to him that kids tell me things all the time and he's not going to tell me anything I can't handle. [A.H.] replied, "Well, he did stick his no-no spot in my back spot." I asked if by "back spot" he meant his bottom. He replied in the affirmative.
>
> I asked where this happened and he replied at his dad's house. I asked where in the house, and he replied "in the bedroom." I asked if it happened in the bed or on the floor, and he replied "in bed." I asked if by "no-no spot" he meant his dad's penis, and he replied, "He sticked his private into my bottom."
>
> Q. So was this a spontaneous statement from the child made to you about this incident between the father and the child?
>
> A. Not entirely spontaneous. It was in the process of give and take where he would share and I would follow up and he would share and I would follow up.
>
> Q. What was described to you, in layman's terms, did it sound like sexual abuse?
>
> A. Yes.

A.H. was holding his stomach during the interview and stated that his stomach hurt. A.H. went to the bathroom twice during the interview. A.H. reported that he needed to calm down and that he went to the bathroom to "get himself calm."

Mr. Herman testified that he diagnosed A.H. with "other specified trauma and stressor related disorder" and specified that his anxiety was related to visits with Father. Mr. Herman testified that A.H. did not appear to be coached or manipulated into making the disclosure. He explained that children who have been coached have sudden shifts in vocabulary or demeanor when they are trying to think of what to say. In particular, children under twelve have difficulty keeping details straight. In contrast, A.H.'s disclosure flowed "quite fluidly" and he was "reluctant to tell me." According to Mr. Herman, when children are coached, they are "too eager" to discuss the abuse. Mr. Herman testified that he found A.H.'s disclosure was "credible."

Kasi Hire, a DCS investigator, testified that she visited Mother's house on September 11, 2020, and interviewed A.H. regarding the sexual abuse allegations. She explained to A.H. that she visits kids "to make sure they are safe." She asked if there was

anything that A.H. felt she should know, and, in response, A.H. made a hand gesture sticking one of his fingers inside a circle he made with his other hand. She asked A.H. to explain the gesture, and he explained his finger represented Father's penis[7] and the circle represented his "butt." A.H. began thrusting his hips back and forth and said that Father made that motion when he was "behind him in bed." A.H. explained that he was awake when this occurred but that Father thought he was asleep and he just laid there because he was "afraid for his dad to know he was awake."

Finally, Father testified through an interpreter. Father unequivocally testified that the alleged abuse did not occur. Father testified that the children sleep with him in his full-sized bed when they visit him. When asked "did you at any point in time stick your penis into your child [A.H.'s] bottom," he responded, "I've never done it. I've never thought about it." Father denied that he commonly wakes up with an erection, and he did not know why A.H. was able to describe an erection. Father stated that A.H. never reported feeling uncomfortable in the shower but that he simply did not want to shower in general. Father believed that A.H. had been coached to make the allegation against him so that Father would not be able to maintain custody of the children. Father testified that he missed the children and wished to see them again.

The trial court found all of the testifying witnesses were credible. Specifically, the court stated in its order:

> 20. The Court finds that all the state's witnesses were credible, but again, that their testimony was similar, but even they did not know what this meant, such as, was it in the anus, in the butt, in the butt crack, or whether he was awake or asleep.
> 21. The Court finds that [Father]'s testimony was credible.
> 22. The Court finds that nobody was lying in today's hearing.

The record does not indicate whether the trial court watched the DVD recording of Ms. Ralston's forensic interview of A.H. [8] Nevertheless, the court found that A.H. was not credible. With respect to A.H.'s credibility, the court held:

> 23. As to the child's credibility, the Court does not find that the child was lying, but that what the child testified to does not make him credible. Whether it is his age, his memory, or the situation, the Court does not find that the allegations lined up with the facts, or lined up with the circumstances, or

---

[7] A.H. speaks English and Spanish and initially used a Spanish slang term for penis.

[8] We infer that the trial court did not view the DVD because the video was over one hour long, and the trial court did not take a recess long enough to watch the video before providing an oral ruling on the day of the hearing.

- 11 -

lined up with the passage of time. The Court does not find that to be believable.

In this case, the circuit court functioned as the trier of fact, and it was the circuit court's duty to "resolve conflicts in testimony" by making "credibility determinations." *Lanier v. Lanier*, No. M2014-02293-COA-R3-CV, 2016 WL 7176980, at *7 (Tenn. Ct. App. Dec. 9, 2016). As a general matter, "[w]e defer to the trial court's determinations of witness credibility because the trial judge could observe the witnesses' demeanor and hear in-court testimony." *Coleman v. Olson*, 551 S.W.3d 686, 694 (Tenn. 2018) (citing *King v. Anderson Cnty.*, 419 S.W.3d 232, 245-46 (Tenn. 2013)). In cases that turn primarily on witness credibility:

> It is the [trial court's] province alone to evaluate the credibility of the witnesses. He is in a better position than a reviewing court to judge a witnesses' veracity because only he can observe their conduct, appearance and demeanor on the stand. When the [trial court] finds that one party is more credible than another, and he chooses to accept that side's version as the truth, his findings are entitled to great weight on appeal and will not be reversed without clear and convincing evidence to the contrary.

*Elsea v. Elsea*, No. 01-A-01-9004-CH00131, 1990 WL 150039, at *3 (Tenn. Ct. App. Oct. 10, 1990) (citing *W.F. Holt Co. v. A & E Elec. Co.*, 665 S.W.2d 722, 733 (Tenn. Ct. App. 1983); *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844, 849 (Tenn. Ct. App. 1982); *Browder v. Hite*, 602 S.W.2d 489, 495 (Tenn. Ct. App. 1980)). However, we have held that, when the trial court did not hear proof directly from the child in court, but only heard the child's disclosures through the statements of others, "the trial court cannot 'insulate [its] findings from review by denominating them credibility determinations.'" *In re Angelleigh R.*, 2021 WL 1994033, at *11 (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)). Thus, even if the trial court had watched the forensic interview of the child, we are "not required to give similar deference to a trial court's findings of fact based on documentary evidence such as . . . [a] video recording[]." *Kelly v. Kelly*, 445 S.W.3d 685, 693 (Tenn. 2014); *see also Peters-Asbury v. Knoxville Area Transit, Inc.*, 544 S.W.3d 354, 359 (Tenn. Ct. App. 2016). "When findings are based on documentary evidence, an appellate court's ability to assess credibility and to weigh the evidence is the same as the trial court's [ability]." *Kelly*, 445 S.W.3d at 693.

Here, the court heard characterizations of the child's disclosures from two expert witnesses and from a DCS investigator and made an adverse credibility finding against the child based on the witnesses' testimony. A DVD of the child's forensic interview was entered into evidence, but the record does not indicate that the trial court watched the

recording. Nevertheless, we have conducted a de novo review of the forensic video and have made our own credibility determination. We believe the child. A.H. told Ms. Ralston that Father touched his erect penis to A.H.'s "butt" or "butt crack" twice in the early morning while A.H., D.H., and Father were all sleeping in Father's full-sized bed. A.H. stated that both he and his Father had clothing on. A.H. stated that Father's hands were on his own ribs; in other words, Father was not holding A.H. in place during the incident. A.H. confirmed that "nothing came out" of Father's penis.

On first blush, this encounter seems to meet the definition of aggravated sexual battery; however, we are unable to discern from A.H.'s description of the incident whether Father *intentionally* touched his erect penis to the child's buttocks or whether the touching occurred while Father was sleeping or as a result of the close proximity of the three people in the full-sized bed. *See* Tenn. Code Ann. § 39-13-501(6). Tennessee Code Annotated section 39-11-106(21) states: "'Intentional' means that the person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." In its order, the trial court stated:

> 5. The Court finds that there has bee[n no] proof or testimony as to whether or not the father was awake or asleep, and that nobody asked that.
> 6. The Court finds that would be an important question to ask and not to make an assumption.

A.H. stated that his back was facing Father and that he remained still during the encounter. Therefore, A.H. could not have known for certain whether Father was awake or asleep during the incident or whether the touching occurred involuntarily. A.H. also did not know what made Father discontinue the behavior. The evidence does not preponderate against the trial court's finding that there is no proof that Father was awake, and there is not clear and convincing evidence that the touching was intentional or a result of Father's "conscious objective."

We are certainly concerned by A.H.'s disclosure and find the incident he described to be disturbing. However, as an appellate court, we are constrained to the record before us and must give "great weight" to the credibility determinations made by the trial court and "defer" to those credibility determinations. *In re Jonathan S., Jr.*, 2017 WL 3149600, at *4; *Coleman*, 551 S.W.3d at 694. Specifically, we are cautioned not to re-evaluate or overturn a trial court's assessment of a witness's credibility "'absent clear and convincing evidence to the contrary.'" *Franklin v. Franklin*, No. W2020-00285-COA-R3-CV, 2021 WL 5500722, at *2 (Tenn. Ct. App. Nov. 24, 2021) (quoting *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (internal citations omitted)); *see also Richards v. Liberty*

*Mut. Ins. Co.*, 70 S.W.3d 729, 733 (Tenn. 2002) ("As this Court has repeatedly emphasized, a reviewing court must give 'considerable deference' to the trial judge with regard to oral, in-court testimony as it is the trial judge who has viewed the witnesses and heard the testimony.").

While we find clear and convincing evidence to overturn the trial court's finding that the child was not credible, we do not find clear and convincing evidence to overturn the trial court's finding that Father was credible. Father unequivocally testified that the encounter A.H. described did not happen. The trial court seemed to conclude that there was not clear and convincing evidence confirming that the incident occurred while Father was awake or that the encounter was a result of Father's conscious objective. Based on our review of the testimony, we agree that there is not clear and convincing evidence to confirm that Father acted intentionally. Therefore, despite our sympathy for the child, we affirm the trial court's finding that there was not clear and convincing evidence of severe abuse.[9]

Likewise, we have reviewed all of the offered grounds and find that dependency and neglect has not been established in this case. We affirm the trial court's finding that the children are not dependent and neglected.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the guardian ad litem, Victoria J. Grelle, for which execution may issue if necessary.

_/s/ Andy D. Bennett_____
ANDY D. BENNETT, JUDGE

---

[9] Although this finding does not change our ultimate holding, we specifically find that the evidence preponderates against the trial court's statement that, "[i]t is inconceivable to the Court that if the event did happen that the child did not react or did not say anything, and the Court cannot align those facts with the reasoning to reach clear and convincing evidence that this event occurred to this child." The child specifically stated that he did not react during the incident because, in his words, "I didn't want [Father] to know that I knowed." We find A.H.'s lack of reaction is a reasonable and age appropriate response for a five-year-old child. This conclusion is supported by Ms. Ralston's testimony that it is common for a child to refuse to confront a parent following an encounter like A.H. disclosed in this case. Ms. Ralston explained that it is "very typical" for a child to "act like nothing happened" after the incident. The evidence preponderates against the trial court's finding to the contrary, and the trial court erred in basing its decision on this incorrect reasoning.